[Civ. No. 11011. Third Dist. Feb. 14, 1967.]

M. H. JONES, Plaintiff and Respondent, v. SACRAMENTO SAVINGS AND LOAN ASSOCIATION, Defendant and Appellant.

Tobin & Tobin, John J. Ford III, Diepenbrock, Wulff & Plant and L. V. Diepenbrock for Defendant and Appellant.

Changaris, Trezza & Ithurburn, James G. Changaris and Malcolm A. Misuraca for Plaintiff and Respondent.

Brobeck, Phleger & Harrison and Howard N. Ellman as Amici Curiae on behalf of Plaintiff and Respondent.

FRIEDMAN, J.—The 13 lots involved in this quiet title action are part of a residential subdivision in Yuba County. These lots were successively the subject of a set of purchase money trust deeds and a set of construction money trust deeds. Sacramento Savings and Loan Association was the lender of construction funds. The suit represents a title contest between plaintiff Jones, who had bought the purchase money notes and bid in the properties at his trustee's sales, and Sacramento Savings, which purchased at sales held by its own trustee. Neither party bid at the other's sales.

The trial court sustained Jones' claim of title and denied that of Sacramento Savings. The latter appeals from the judgment. Its purported appeal from an order denying a new trial is dismissed, the order being nonappealable.

The earlier group of trust deeds secured purchase money loans of $806.45 per lot. All were recorded August 21, 1959. All contained subordination provisions, the effect of which is now in dispute.[1] Yuba County Title Company was designated as trustee.

Somewhat over a year later the owners took out construction loans aggregating $143,900 and approximating $11,000 to

[1] The printed trust deeds contained the following subordination agreement:

"By the acceptance of this deed of trust: The beneficiary hereby authorizes and instructs the trustee, on demand of the Trustor, or their [*sic*] successor in interest, without notice, demand or further instruction, to subordinate the priority of this trust deed to a construction or improvement loan or a permanent loan on said property so long as the loan is extended by a conventional financial institution and the amount of said

$12,000 a lot. The owners gave Sacramento Savings instalment notes with principal and interest payable at the rate of $86 per month. These notes included a due-on-sale clause, giving the holder an option to accelerate maturity upon any sale by the borrower.[2]

Before making the construction loans Sacramento Savings issued escrow instructions to Yuba County Title Company, stating: "Please secure subordination." The title company refused to issue insurance covering the Sacramento Savings trust deeds unless it received additional subordination agreements from the trustee of the purchase money trust deeds. Sacramento Savings then withdrew the escrow from Yuba County Title Company and another title company became the escrow depositary. Sacramento Savings then made the construction loans and its deeds of trust were recorded. No subordination agreements were executed, other than those contained in the purchase money trust deeds.

Homes were built on the 13 lots. Both the purchase money loans and the construction loans became delinquent. Jones bought up the defaulted purchase money notes and commenced the sale of individual parcels. The parties have effectually stipulated that Jones' proceedings complied with Civil Code section 2924, in that notices of default were properly recorded and notices of the trustee's sales given. At sales held in August and September 1961, Jones bid in three of the lots. At trustee's sales held in February and April 1962 he bid in three more lots.

In the meantime Sacramento Savings' trustee commenced

loan is at least three times the amount of the note which this trust deed is given to secure."

A typewritten addendum declared:

"Notwithstanding the language contained in said Subordination Agreement, it is understood that any such deed of trust must be extended by a licensed bank, savings and loan association, insurance company, or the Federal National Mortgage Association and provided said loan has a maturity of not less than fifteen years.

"A construction loan as referred to in said Subordination Agreement shall be considered prior to this deed of trust only should there be a permanent take-out committed by a licensed bank, savings and loan association, insurance company or the Federal National Mortgage Association."

[2] The acceleration clause declared:

"If the trustor shall sell, convey or alienate the property described in the deed of trust securing this note, or any part thereof, or any interest therein, or shall be divested of his title, or any interest therein, in any manner or way, whether voluntary or involuntary, any indebtedness or obligation secured thereby, irrespective of the maturity dates expressed in any note evidencing the same, at the option of the beneficiary hereof, and without demand or notice, shall immediately become due and payable."

sale proceedings under the construction money trust deeds. In November 1961 it caused notices of default to be recorded against 11 of the lots. In May 1962 Sacramento Savings bid in these 11 lots at a sale held by its own trustee. Six of these were the lots which had already been sold to Jones at sales held by his own trustee. The other five had not yet been foreclosed by Jones, and as to these the sales to Sacramento Savings preceded the sales to Jones under the purchase money trust deeds. The remaining two lots were the subject of sales to Jones in April 1962 and to Sacramento Savings in November 1962. Not only did the timing of the various trustee's sales overlap; so did recordation of notices of default and notices of sale. Neither party chose to bid at any of the other's sales. Neither chose to exercise a junior lienor's right to reinstate the senior loan after the latter had become delinquent. (See Civ. Code, § 2924c.) Each, apparently, relied upon the assumption that its own trust deeds had superiority.

Sacramento Savings asserts priority of its construction money trust deeds on the theory that the subordination provision of the earlier trust deeds (fn. 1, *supra*) operated automatically for the benefit of the construction lender, requiring no separate subordination document. It also claims equitable seniority, urging that equity will impose a subordinating lien to carry out the parties' intent, although their contract language may fall short, citing *Coast Bank* v. *Minderhout,* 61 Cal.2d 311, 313-314 [38 Cal.Rptr. 505, 392 P.2d 265].

Whatever their merit in an appropriate case, these claims are not dispositive here. ▪ A lender may agree to subordinate his lien to a later encumbrance upon specified conditions; in order to achieve priority, the later encumbrance must substantially respond to these conditions. (*Collins* v. *Home Savings & Loan Assn.,* 205 Cal.App.2d 86, 95 [22 Cal. Rptr. 817]; Comment, 52 Cal.L.Rev. 157, 166-167; California Land Security and Development (Cont. Ed. Bar) pp. 132-138; see also *Bank of America* v. *Hirsch Mercantile Co.,* 64 Cal.App.2d 175, 183 [148 P.2d 110].) The construction loans of Sacramento Savings departed substantially from the subordination conditions of the purchase money trust deeds. As printed, the latter permitted subordination either to a construction or permanent loan. The typewritten addendum qualified these alternatives, requiring that the construction loan be accompanied by a "permanent take-out" commitment and that any "permanent" loan have a maturity of not less than 15 years.

Although the term "take-out" does not seem to have received judicial definition, the transaction of that name is a common feature of residential subdivision financing. The term refers to the permanent secured loan which the ultimate home buyer floats to finance his purchase of the dwelling and which supersedes or "takes out" the interim construction loan secured by the subdivision developer. (California Land Security and Development (Cont. Ed. Bar), *supra*, pp. 552-553; see, e.g., *Magna Development Co.* v. *Reed,* 228 Cal.App.2d 230, 236 [39 Cal.Rptr. 284].) The commitment in turn is a statement from a lending institution (or, in the case of Federal National Mortgage Association, a loan buyer) that financing to a specified amount will be available to qualified home buyers. No permanent take-out commitment was supplied here.

The notes taken by Sacramento Savings were payable at the rate of $86 per month, including interest, but could be called, at the holder's option, upon the developer's sale of the property.[3] Thus the very objective of the subdivider's borrowing, construction of a house and sale to a home buyer, would permit acceleration of the note. The due-on-sale clause gave the construction lender a wide range of options. It might elect to continue the subdivider as its primary obligor; or, if a home buyer of satisfactory credit appeared, permit the latter to assume the "construction" loan; or choose to exercise the power of sale conferred by its deed of trust, putting the subordinate lienholder under economic pressure to bid in the property. A construction loan accompanied by such options fell far short of supplying the "permanent" or 15-year financing demanded by the purchase-money lienholder as a condition of subordination.

There is no reason why priority of a later lienholder should not be made to depend upon compliance with these conditions.[4] They represent a means by which the purchase money lienholder protects himself against the subdivider's default

[3]Such an acceleration option is not an invalid restraint upon alienation. (*Coast Bank* v. *Minderhout, supra,* 61 Cal.2d at pp. 315-316; Hetland, *Real Property and Real Property Security: The Well-Being of the Law,* 53 Cal.L.Rev. 151, 165-171.)

[4]We do not inquire whether the subordination provisions of the purchase money trust deeds contained all the specifications necessary to permit specific performance. (See *Handy* v. *Gordon,* 65 Cal.2d 578, 580-581 [55 Cal.Rptr. 769, 422 P.2d 329]; Comment, 52 Cal.L.Rev. 157, 160-164, California Land Security and Development (Cont.Ed.Bar), *supra,* p. 133.) After execution of the later financing, the question is not one of prospective enforcement but of compliance with the subordination conditions of the earlier loan, however scanty.

after the construction loan is made. A take-out commitment or, in the alternative, a long-term loan will assure the availability of consumer financing despite the property developer's insolvency. Either device tends to enhance the property's value, promote its marketability and avoid distress sale if the subdivider encounters financial trouble. The interim financing supplied by Sacramento Savings and Loan Association did not supply this protection. Consequently it failed to achieve superiority over the earlier lien of the purchase money trust deeds.

There is no claim that any of the trustees' sales produced bids exceeding the secured debt. ▮ The sales to Jones in enforcement of the senior liens wiped out the junior liens of Sacramento Savings. (*Call* v. *Thunderbird Mortgage Co.,* 58 Cal.2d 542, 548 [25 Cal.Rptr. 265, 375 P.2d 169]; *Sohn* v. *California Pac. Title Ins. Co.,* 124 Cal.App.2d 757, 767 [269 P.2d 223]; *Barr Lumber Co.* v. *Shaffer,* 108 Cal.App.2d 14, 16-23 [238 P.2d 99].) In those cases where Jones' trustee was the first to give notices and hold sales, the subsequent sales conveyed no title to Sacramento Savings and succeeded only in clouding Jones' title. (*Metropolis etc. Sav. Bank* v. *Barnet,* 165 Cal. 449, 455 [132 P. 833].) Where Sacramento Savings' trustee was the first to give notices and hold sales, Sacramento Savings purchased title subordinate to the senior liens of the purchase money trust deeds. (*Penziner* v. *West American Finance Co.,* 10 Cal.2d 160, 180 [74 P.2d 252]; *Streiff* v. *Darlington,* 9 Cal.2d 42, 45 [68 P.2d 728].) It is immaterial that in some cases the junior lienholder was the first to give notice and hold sales. (*Martin* v. *Hildebrand,* 190 Cal. 369, 372 [212 P. 618]; *Woods* v. *Kellerman,* 3 Cal.App. 422, 425 [89 P. 358]; see also *Carpenter* v. *Smallpage,* 220 Cal. 129, 132 [29 P.2d 841, 30 P.2d 995]; 34 Cal.Jur.2d, Mortgages, § 463, p. 141.)

Sacramento Savings charges Jones with unclean hands. It points out that equity's denial of relief extends not only to outright fraud, but to any kind of unconscionable conduct on a plaintiff's part. ▮ The evidence indicates that Jones bought up the purchase money notes (of the face amount of $806.45 each) at a discount, knowing that the value of the lots securing them had been enhanced by the construction of homes financed by Sacramento Savings. Presumably Jones was also aware that he was buying deeds of trust burdened by subordination provisions.

There is nothing unconscionable in such conduct. Neither

party lacked notice of any step taken by the other. Whatever of value Jones might gain is attributable: (a) to the disingenuous draftsmanship of Sacramento Savings, which sought subordination of the purchase money liens by supplying the form but not the substance of long-term financing; (b) to Jones' willingness to gamble on continued superiority of the purchase money liens; (c) to Sacramento Savings' expenditure of construction money in the face of recorded purchase money liens and its misplaced reliance on the subordinating effect of its own loan papers; (d) to Sacramento Savings' unwillingness to reinstate the defaulted purchase money loans (Civ. Code, § 2924c) or to bid in at the ensuing sales. Jones did nothing to prevent these latter steps. Had Sacramento Savings chosen to take either action, it could have protected its own large investment in these lots and limited Jones' profit to the difference between the unpaid purchase money notes and the discounted price paid for them by Jones.

Nevertheless, Sacramento Savings seeks an equitable lien premised upon the doctrine of unjust enrichment, pointing out that a decree for the plaintiff will present him with the financial benefit of expensive improvements constructed with its money. It assigns trial court error in the denial of its motion to amend pleadings and in the rejection of its request for findings permitting imposition of such a lien. It cites the following text statement: ''The general doctrine, that equity will create a lien on property where this is necessary to accomplish justice, is not confined to situations involving defective mortgages, but extends to any case where the parties attempt to make property security for an obligation. [Citations.] In some cases the lien is created as a desirable remedy though the parties did not in fact intend to make the property security for an obligation; e.g. where the object is to prevent unjust enrichment. [Citations.]'' (1 Witkin, Summary of Cal. Law (1960) p. 707.)

■ We have concluded that Sacramento Savings is entitled to an equitable lien on the properties in Jones' hands. Nonconflicting evidence demonstrates and this court finds that both the then owner and the lender intended that the construction loan be secured by first liens; that the savings and loan association advanced construction funds of $143,900 in reliance, however erroneous, on expected first liens; that the loan funds were actually applied to the construction of improvements having a value far exceeding that of the land;

that Jones, buyer of liens on the land, was aware of the improvements financed by the lending institution when he bought these liens. Since he paid a discounted price for the purchase money notes, his investment is but a fraction of the value of the improved properties. He would be unjustly enriched were he permitted to hold or sell the properties without making restitution for the improvements built at the expense of the savings and loan association.[5]

 A general doctrine of equity permits imposition of an equitable lien where the claimant's expenditure has benefited another's property under circumstances entitling the claimant to restitution. (*McColgan* v. *Bank of California Assn.*, 208 Cal. 329, 338 [281 P. 381, 65 A.L.R. 1075]; *Stockwell* v. *Mutual Life Ins. Co.*, 140 Cal. 198, 202-203 [73 P. 833, 98 Am.St. Rep. 25]; *Ohio Electric Car Co.* v. *Duffet*, 48 Cal.App. 674, 678 [192 P. 298]; Rest., Restitution, § 161, com. a; *ibid.*, § 170; 4 Pomeroy's Equity Jurisprudence (5th ed.) § 1235, pp. 696-699; 3 Pomeroy's Equity Jurisprudence (5th ed.) § 390, p. 67; Comment, 17 Cal.L.Rev. 411.) A specific application of the doctrine occurs when a lender advances money which benefits the land of another in mistaken reliance upon an imperfect mortgage or lien upon that land. (*Estate of Pitts*, 218 Cal. 184, 189 [22 P.2d 694]; *Smith* v. *Anglo-California Trust Co.*, 205 Cal. 496, 502-504 [271 P. 898]; *Beckwith* v. *Sheldon*, 168 Cal. 742, 746-747 [145 P. 97, Ann. Cas. 1916A 963]; see 17 Cal.L.Rev. at pp. 412-413.) The present circumstances fit both the general doctrine and the specific rule with nicety.

It is necessary that the lien claimant's money be spent upon the expected security of the property against which the lien is sought. (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.*, 61 Cal.2d 728, 732 [40 Cal.Rptr. 85, 394 P.2d 829].) The evidence permits no question but that such reliance existed here.

 A quiet title suit aimed at terminating claims upon real estate is in one sense a strict foreclosure. (*Petersen* v. *Ridenour*, 135 Cal.App.2d 720, 728 [287 P.2d 848].) Equitable principles apply in a quiet title action and, in the absence of a breach of duty, the court may protect against for-

---

[5]It is appropriate that we exercise our power to make these findings, additional to those of the trial court, where the record contains nonconflicting evidence justifying the judgment's reversal with directions to provide relief to the appellant. (Cal. Const. (1966) art. VI, § 11; Code Civ. Proc., § 956a; *Tupman* v. *Haberkern*, 208 Cal. 256, 269-270 [280 P. 970]; 3 Witkin, Cal. Procedure (1954) pp. 2394-2397.)

feiture. (*Gonzalez* v. *Hirose,* 33 Cal.2d 213, 217 [200 P.2d 793].) There is a distinction between a constructive trust arising from the property owner's wrongdoing and an equitable lien imposed to prevent his unjust enrichment. The former may call for sale of the property and distribution of its proceeds. Equity imposes a lien here not to vindicate a wrong but to prevent unjust enrichment. The objective may be accomplished by a decree impressing the lien but without demanding an immediate sale. (*Gonzalez* v. *Hirose, supra,* 33 Cal.2d at p. 217; *Warner Bros. Co.* v. *Freud,* 138 Cal. 651, 654-656 [72 P. 345] ; *Petersen* v. *Ridenour, supra,* 135 Cal.App.2d at p. 728; Rest., Restitution, § 161, com. b.) Equitable liens in favor of Sacramento Savings should be paid off at such times and under such circumstances as will avoid undue hardship on Jones. The record on appeal does not disclose whether any of the homes has been marketed. Framing of an appropriate decree to protect the parties' respective interests should await further inquiry and consideration by the trial court.

■ The circumstances do not call for an award of interest as part of the lien, either before or after judgment. The lien is not created to enforce an express or quasi contractual obligation, but will originate in the decree of equity. (*Hayward Lumber & Inv. Co.* v. *Coast etc. Assn.,* 47 Cal.App.2d 211, 214 [117 P.2d 682] ; 4 Pomeroy's Equity Jurisprudence, § 1238, p. 711.) Thus, neither the interest rate fixed by the promissory notes nor interest under Civil Code section 3287 is payable.[6] The judgment imposing the lien will not be a money judgment, will simply establish a charge on property and will not bear interest in favor of the equitable lienholder. (*Sullivan* v. *Wellborn,* 32 Cal.2d 214, 219 [195 P.2d 787] ; see also *Estate of Neilson,* 57 Cal.2d 733, 749 [22 Cal.Rptr. 1, 371 P.2d 745].) We leave open the question whether interest would run in the event the landowner failed to pay off the equitable liens in compliance with such conditions as the trial court might embody in the judgment. (See *Sullivan* v. *Wellborn, supra.*)

■ Jones opposes imposition of equitable liens, contending that an allowance for improvements made by the defendant may not be allowed except as a setoff against damages for withholding possession of the property (citing Code Civ.

---

[6]Section 3287 provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day. . . ."

Proc., § 741;[7] *Huse* v. *Den,* 85 Cal.390, 401 [24 P. 790, 20 Am.St.Rep. 232]; *Taliaferro* v. *Colasso,* 139 Cal.App.2d 903, 906 [294 P.2d 774]; *Wood* v. *Henley,* 88 Cal.App. 441 [263 P. 870]). Since Jones asks for no damages, he seeks total rejection of Sacramento Savings' claim for the value of improvements.

Section 741 deals with "innocent improvers" who mistakenly spend money on the land of others. (*Taliaferro* v. *Colasso, supra,* 139 Cal.App.2d at p. 906.) So far as we have ascertained, the California courts have not yet confronted this statute in relation to the established doctrine awarding an equitable lien to a lender who claims under an imperfect security instrument. Given the broad application sought here, section 741 would foreclose the doctrine as applied for the benefit of construction money lenders or, for that matter, mechanics' lien claimants. (Cf. *Smith* v. *Anglo-California Trust Co., supra,* 205 Cal. 496.) By its very terms, however, the statute applies to one who makes improvements while "holding" the land, not to one who has supplied services to its acknowledged owner or lent him money in reliance upon a security instrument.

During trial the court rejected Sacramento Savings' motion to amend the pleadings "to conform to proof" and raising new theories of unjust enrichment and equitable lien. It is appropriate to comment on that order, since our decision is inconsistent with it. In making his motion counsel for Sacramento Savings overlooked the matter of amending the pretrial conference order. Amendment of that order is at least as vital as amendment of the pleadings. (See rule 216, California Rules of Court.) The essence of the matter is to avoid the concurrence of surprise and prejudice. The procedural crystallization of issues by a pretrial conference order may collide with equity's traditional desire to afford complete relief. In this case the evidentiary inquiry was the same, whether the parties sought the complete obliteration of each other's title or the softer remedy proposed here. The very evidence which the parties marshaled to support their clashing claims of priority serves now to demonstrate the essential elements of equitable lien entitlement. There is no real conflict in the

---

[7]Section 741 provides:

"When damages are claimed for withholding the property recovered, upon which permanent improvements have been made by a defendant, or those under whom he claims, holding under color of title adversely to the claim of plaintiff, in good faith, the value of such improvements must be allowed as a set-off against such damages."

evidence, which demonstrates Sacramento Savings' advance of money in misplaced reliance on the security of the property and Jones' unjust enrichment were relief to be denied. No evidence outside the present record is needed to support findings appropriate to equitable lien imposition. As this court noted in *B. C. Richter Contracting Co.* v. *Continental Cas. Co.*, 230 Cal.App.2d 491, 503 [41 Cal.Rptr. 98] : "There was no variance in the sense that defendants became vulnerable to unexpected evidence or unanticipated conditions." (See also, *Kessler* v. *Sapp*, 169 Cal.App.2d 818, 823-824 [338 P.2d 34].) Under circumstances such as these the allowance of time for briefing by the attorneys may frequently allay any prejudice otherwise stemming from alteration of the enumerated issues.

The judgment is reversed and the cause remanded with directions to enter judgment and to take such other proceedings not inconsistent with this opinion as may be necessary or appropriate.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied March 10, 1967, and respondent's petition for a hearing by the Supreme Court was denied April 12, 1967. Traynor, C. J., and Burke, J., were of the opinion that the petition should be granted.