[Civ. No. 28085. First Dist., Div. Two. Dec. 23, 1971.]

BEN M. WOODWORTH, Plaintiff and Appellant, v.
REDWOOD EMPIRE SAVINGS & LOAN ASSOCIATION et al.,
Defendants and Respondents.

348

## COUNSEL

Leonard & Dole, Stuart Dole, Burd, Hunt & Friedman and Peter Hunt for Plaintiff and Appellant.

Anderson, McDonald & Belden, Anderson, McDonald, Belden & Kelly, John E. McDonald, DeMeo, DeMeo, Foster, Waner & Hood, DeMeo, DeMeo, Foster & Waner and B. Scott Foster for Defendants and Respondents.

## OPINION

**TAYLOR, P. J.**—Plaintiff, Ben M. Woodworth (hereafter Woodworth) lost his interest in a parcel of real property known as the Linda Del Mar Subdivision Number One in Petaluma, comprising approximately 42 acres subdivided into 199 lots, upon foreclosure of construction loans by the savings and loan association respondents. Woodworth sought declaratory and other relief from the savings and loan respondents, as well as Sonoma County Title, the original escrow agent, and Redwood Empire Title, the successor trustee of the deeds of trust (hereafter title company respondents). On this appeal[1] from the judgment in favor of the savings and loan respondents and the two title companies, Woodworth asserts that: 1) the trial court erred to his prejudice and surprise by permitting a belated amendment of the pleadings and the pretrial conference order to include the affirmative defense of estoppel;[2] 2) the lien created by his previously recorded deed of trust was not validly subordinated to the liens created by the deeds of trust of the savings and loan respondents, as the automatic subordination clause of his deed of trust was void for vagueness; 3) even if the automatic subordination clause was valid and enforceable, the trial court erred in concluding that he was estopped from asserting either that the loans secured by any deed of trust were obtained from a source not specified in the automatic subordination clause, or that the funds were not disbursed according to requirements of the subordination clause; 4) the savings and loan respondents were not entitled to lien priority and extinguishment of his interest by the foreclosures, but acquired only an equitable lien for the amount of their construction loans; and 5) he established his cause of action for negligence against the title company respondents and is entitled to damages, as well as his attorney's fees in this action. For the reasons set forth more fully below, we have concluded that the judgment must be affirmed.

Viewing the record most strongly in favor of the judgment, the following chronology of the facts appears. About 1951 or 1952, Woodworth purchased a 38.5-acre parcel in Sonoma County for $59,000 and a contiguous 4.3-acre parcel. Woodworth commenced the preparation of plans and took the necessary steps to subdivide and sell the property, including the filing of various applications with appropriate government agencies, the

---

[1]Pursuant to California Rules of Court, rule 2(c), the premature notice of appeal dated December 23, 1969, from the memorandum opinion of October 1, 1969, is deemed a timely notice of appeal from the final judgment entered April 16, 1970.

[2]This contention does not warrant discussion as the record indicates (and Woodworth so conceded at oral argument) that the pretrial conference order dated April 28, 1967, specifically referred to the issues of estoppel.

employment of an engineer to survey the property, and prepare a subdivision map, and the employment of an attorney, Mr. Dole, to represent him before the Public Utilities Commission. From 1952 to July 1959, Woodworth appeared in 44 hearings before various governmental bodies in support of his various applications for permits to subdivide his real property. During this period, Woodworth was a licensed real estate salesman and actively, but unsuccessfully, attempted to sell his real property to third persons.

In July 1959, Woodworth discussed the subdividing and sale of his property with Charles Jess, a real estate subdivider (hereafter Jess) from southern California, whom Woodworth had not previously met. After about three weeks of negotiations, Woodworth and Jess orally agreed: that Woodworth would sell his real property to a newly created corporation, Atwater Investment Company (hereinafter Atwater), which would issue all of its stock to Woodworth and Jess. Woodworth was to receive Atwater's promissory note for $133,000 and would serve as a director of Atwater. Atwater was to subdivide the property, construct homes and sell the homes and lots. Woodworth was induced to enter the oral agreement in anticipation and expectation of his right as a director to participate in the management of Atwater and his opportunity as a shareholder to derive a greater individual profit than he would have received as a result of a direct cash sale of his property to Atwater.

Thereafter, Woodworth employed and was represented and advised by independent legal counsel (Mr. Moskowitz) in the negotiations and preparation of subsequent written agreements embodying the terms of the oral agreement. After numerous conferences betwen Mr. Moskowitz and Mr. Nielsen, legal counsel representing Jess and Atwater, the parties on August 19, 1959, signed two written agreements: the first, an "Agreement for Sale of Real Property," was signed by Woodworth individually and by Jess as president of Atwater; the second, a letter from Woodworth to Atwater was signed by Woodworth and by Jess individually and as president of Atwater.

Pursuant to the August 19, 1959, agreements: 1) Woodworth on August 28, 1959, executed and delivered a deed conveying his real property to Atwater; 2) Atwater executed and delivered its promissory note, secured by a deed of trust. The deed of trust contained the "automatic subordination clause" (set forth below)[3] subordinating Woodworth's interest as seller

---

[3] The pertinent portion of the automatic subordination clause provided:
"A. Trustor or its successors in interest, is hereby given the right to borrow from any banking institution, building and loan association, federal or state savings and loan association or life insurance company, funds to be used for building construction purposes and subdivision improvement purposes on all or any of said lots or

to the liens of construction loans made by specified kinds of lending institutions; 3) on August 27, 1959, the original directors of Atwater met and authorized the application for a permit to issue stock in the amount of $700 to Jess and $300 to Woodworth, and authorized Jess, as president, to execute any and all documents on behalf of Atwater to complete the purchase of Woodworth's land pursuant to the agreements of August 19, 1959; and 4) on August 29, 1959, the original directors of Atwater met and elected Woodworth a director, vice president and assistant secretary of the corporation. At the same time, Jess, as president, and Woodworth, as vice president, were authorized to execute any documents necessary, convenient or proper for the development of the real property. The minutes of the August 29 meeting were approved by Woodworth as evidenced by his signature.

In their initial discussions, Jess assured Woodworth that he (Jess) had the funds needed to finance the off-site improvements required by the City of Petaluma as a condition of the subdivision permit. The subsequent discussions revealed that Atwater would have to borrow the money for the off-site improvements. Woodworth understood that these loans would be secured by a lien against the land that would be prior in right to the lien of his deed of trust from Atwater.

In July or early August, while Woodworth was in Moskowitz's office with Jess and his attorney, Mr. Seltzer, Moskowitz (who suspected that Jess had no money) had Jess call up the purported financiers in San Diego. Woodworth and Moskowitz clearly understood from the telephone conversation that "there wasn't any money, these people had no idea of loaning Jess that money, and Jess didn't have it." Immediately after the conclusion of the telephone conversation, Jess and Seltzer indicated that they knew of an outfit in San Jose. The following day, Jess and Nielsen indicated that they were working out a deal with Porter Trust Deed Investment Company (hereafter Porter) for the money for the off-site improvements, and that the loans would cost "an awful lot of money," 10 percent interest and points.

---

parcels of land, such loans to be secured by mortgages or deeds of trust thereon, which mortgages or deeds of trust and any renewal or replacements thereof when duly recorded in the office of the County Recorder of said Sonoma County at any time prior to the recording in said recorder's office of a Notice of Default under the terms of this deed of trust, shall without the necessity of any approval by the beneficiary, or of any other or further instrument of subordination become liens and charges upon any such lots or parcels of land as described therein, prior and superior in liens to this deed of trust.

"B. The amount of such loans, the terms of repayment and interest rate shall be such as are determined by the lender and the recording of such mortgages or deeds of trust shall conclusively establish the fact of such determination."

Shortly after the execution of the agreements, Woodworth further learned that Porter would obtain the money for the off-site improvements, coming from a great many small investors. Thus, in August 1959, Woodworth realized that "a subordination agreement was to be given to anyone who furnished funds for the off-site improvements or development of the tract, and I was to give another subordination on my first deed of trust to anyone that furnished the construction loans, which would be the savings and loan companies."

Jess arranged for Atwater to borrow the off-site improvement money totaling about $538,000 from Porter, repayments in accordance with 380 individual promissory notes from Atwater to Porter, each note secured by a deed of trust covering a particular lot. Woodworth knew and understood that 200 were first deeds of trust securing a promissory note in the amount of $1,875 prior in right to the deed of trust securing Woodworth's promissory note from Atwater; the remaining 180 were second deeds of trust securing promissory notes in the amount of $904. Woodworth was prepared to make any agreement or arrangement, whether or not consistent with the conditions of his subordination clause, in order to obtain the necessary financing of the subdivision and avoid losing the sale to Atwater.

Respondent, Sonoma Title, was employed by Woodworth and Atwater to act as the escrow agent to carry out the agreements of August 19, 1959, and the financing agreement between Atwater and Porter. Attorneys Moskowitz and Dole, on behalf of Woodworth, gave written instructions to Sonoma Title as to: 1) the procedure for recording the deed from Woodworth to Atwater and the deed of trust from Atwater to Woodworth; 2) the disbursements of loan proceeds; and 3) the recordation of the various deeds of trust from Atwater to Porter securing the repayment of the off-site improvements.

A letter dated September 18, 1959, from Moskowitz to Sonoma Title, indicated that each of the Porter deeds of trust would be prior in right to Woodworth's deed of trust from Atwater. On October 16, 1959, Moskowitz, on behalf of Woodworth, advised Porter by letter as to the exact recording and disbursement procedure, and indicated that each deed of trust securing Porter's promissory notes would be first and second deeds of trust, each prior in right to Woodworth's deed of trust. The second deeds of trust contained automatic subordination clauses in exactly the same language as that in Woodworth's deed from Atwater.

Thereafter, at the request of Porter, the promissory notes and deeds of trust from Atwater were made payable to Barnes, who had facilitated the financing arrangements with Porter. Barnes immediately endorsed and assigned the notes and deeds of trust to Porter. Sonoma Title, pursuant to the instructions from Woodworth's attorneys and Porter's attorneys, pre-

pared the necessary documents and included the subordination clause in the promissory notes and deeds of trust dated October 15, 1959. Woodworth's deed of trust and promissory note from Atwater were recorded on October 19, 1959. Thereafter, Woodworth appeared, sometimes alone and at times together with Jess, at the offices of Sonoma Title to sign the notes and deeds of trust as officers of Atwater.

On October 19, 1959, Jess withdrew about $55,000 from Sonoma Title. Woodworth called Moskowitz and ascertained that his countersignature was not required and that nothing could be done.

On November 10, 1959, Woodworth received from his attorney Moskowitz a letter providing a detailed status report of the escrow and financing proceedings. The letter enclosed a copy of the statement of Sonoma Title showing all receipts and disbursements to date and further advised Woodworth, as set forth below.[4]

---

[4]"Porter has also agreed that the first $55,000.00 will be made immediately available to Atwater. The next $400,000.00 will be accumulated so that it may be deposited as a cash deposit with City of Petaluma and ear-marked for payment of the cost of construction of subdivision improvements. This procedure is being followed because the bonding company has refused to issue a subdivision bond until $400,000.00 in cash has been deposited and ear-marked for the same purpose. The bonding company would require payment of a premium of something over $7,000.00 for such a bond. Since the requirements of the bonding company and of the City are the same, it appears desirable to save the bond premium. However, the subdivision map will not be qualified for recording until the $400,000.00 has been accumulated and deposited with the Treasurer of the City of Petaluma.

"The sale from you to Atwater has been consummated so that your deed to Atwater has been recorded and Atwater's deed of trust to you has also been recorded. The assignment of the deed of trust for the benefit of Rocca, et al has also been recorded. It was necessary to do this in order to get the funds from Porter. The funds from Porter are being advanced on notes and deeds of trust covering lots within the subdivision, but described by metes and bounds rather than lot number.

"The Krulevitch transaction has not yet been closed although everything is in order and ready to go except for some modified instructions from the Bank of America. Apparently Krulevitch and the bank are working out a method of financing the construction of his new home and as soon as the modified instructions are received from Catelli of the Bank of America, this part of the transaction will close.

"I am enclosing a copy of the title company's statement of November 6, 1959 showing all receipts and disbursements up to date. You should disregard the cash deposit of 9/25 which was the cash deposit made by Charlie Jess for the purpose of paying off the taxes. This receipt is as you see offset by a repayment to Jess on October 19 of $1,000.00 Thus, the total received from Atwater is $55,207.36, representing the net proceeds of first and second deeds of trust on 23 lots. You will recall that each first deed of trust nets Atwater $1,650.00 and each second deed of trust nets Atwater $750.32.

"The statement also itemizes disbursements showing the charges made for title insurance, recordings, etc. as well as other expenditures. You will observe that Charlie Marshall has been paid $2,800.00. This is in addition to $1,200.00 earlier advanced to him by Charlie Jess. Charlie Marshall has therefore received a total of $4,000.00 and appears to be reasonably happy.

"The statement also shows a payment to Krulevitch in the amount of $15,500.00.

On March 9, 1960, Woodworth initialed at least three of the 22 subcontract agreements between Jess Concrete and various subcontractors. About May 3, 1960, the date of the recordation of the Barnes deeds and assignments thereof to Porter, subsequent assignments from Porter to third party investors and the payment of loan proceeds from Porter to Sonoma Title for the Atwater account were completed. The moneys received were disbursed in accordance with the Barnes-Atwater agreement of September 19, 1959, and written instructions from Porter as well as from Moskowitz and Woodworth.

On January 2, 1960, Woodworth, on behalf of Atwater, signed the construction agreement with Jess Concrete Company for the construction of 203[5] homes in the subdivision. Pursuant to the construction agreement, Atwater agreed to pay Jess Concrete Company $125 per house, in addition to all allowable costs and expenses as further detailed in the agreement. Woodworth was specifically authorized to sign this agreement on behalf of Atwater by a directors' resolution.

On February 29, 1960, the Atwater board of directors met and authorized its president, Jess, to execute such promissory notes and deeds of trust as may be necessary, convenient or proper to place individual and/or group construction loans against any of the lots in the subdivision. Woodworth approved this authorization as evidenced by his signature of the minutes.

During the same period of time, Woodworth and Jess, on behalf of Atwater, met with officers of a number of the savings and loan respondents[6] and applied for construction loans for the homes to be built and sold

---

Actually this has not been paid to Krulevitch yet but is being held by the title company to close the Krulevitch transaction when it is otherwise ready to close. The statement also shows the payment of $5,000.00 to you, the reimbursement to Charlie Jess of $1,000.00 and payment of the *blood money* of $1,950.00 to Barnes. This is at the rate of $150.00 per lot on thirteen lots. There is an additional $1,500.00 owing to Barnes which will be paid out of the next funds received.

"$25,000.00 of these funds have been paid to Atwater and I have received no breakdown from Charlie Jess as to how these funds have been disbursed, if at all. However, Jess tells me that he has bids for the construction work and that the work itself should be under way within the next day or so. This was told to me on last Wednesday, November 4, and I know nothing further about this subject than that." (Italics added.)

[5]Subsequently, because of the position of certain off-site improvements, only 199 homes were constructed.

[6]Although initially Woodworth denied that he participated in or helped to negotiate for any but one of the construction loans made by the savings and loan respondents, the record indicates that Woodworth participated in the negotiations with respondent, Redwood Empire, and respondent, Santa Rosa Savings, in obtaining the construction loans for Atwater. On the latter occasion, Woodworth was aware that Dan Noonan, a money broker, was present but made no inquiry or objection concerning the expense of Mr. Noonan's services.

by Atwater. At a meeting in February 1960 with respondent, Redwood Empire Savings and Loan, at which Woodworth was present, Jess provided a list of construction costs that included the $1,875 deed of trust to Porter. On April 7, 1960, Woodworth signed an application for fire and comprehensive insurance covering the homes to be built by Atwater. On June 22, 1960, Woodworth signed, on behalf of Atwater, instructions to respondent, Fidelity Savings and Loan, ordering the disbursement of loan proceeds to the Bear Flag Builders Control for payment of various subdivision and construction costs. Woodworth also signed, on behalf of Atwater, 16 promissory notes and deeds of trust in favor of respondent, Richmond Savings and Loan, to secure construction loans.

Ground was broken on March 9, 1960, and construction of the off-site improvements commenced. Arrangements were made for all of the construction loan proceeds to be received and distributed through Bear Flag Builders Control. Jess, on behalf of Atwater and Bear Flag, entered into various control agreements, whereby Bear Flag agreed to receive and disburse the loan proceeds from each of the savings and loan respondents. Copies of the control agreements were sent to Atwater and the savings and loan respondents. Jess' execution of the control agreements was authorized by an Atwater directors' resolution dated February 29, 1960, which was delivered to Bear Flag.

Woodworth and Jess met many times with one of the principals of Bear Flag to discuss what payments were to be made from the construction loan proceeds. As a result of these meetings, Atwater prepared and submitted to Bear Flag a lot cost sheet showing the moneys to be paid from construction loans by Bear Flag for each home constructed. Copies of these lot cost sheets were furnished to each of the savings and loan respondents in accordance with their respective requirements. The lot cost sheet specifically provided for payment of points and interest to Porter on its second deeds of trust. By a letter dated March 16, 1960, Bear Flag gave written notice to Porter of the assignment of $1,875 from each of the third progress payments received from the savings and loan respondents.

Bear Flag had been informed that the Porter deeds of trust were first liens that were required to be paid off before a construction loan could be placed against the property by any of the savings and loan respondents. Bear Flag received approximately $2,274,304.16 from the savings and loan respondents and disbursed the amount in accordance with the lot cost sheet approved by Woodworth but only after having first received from Atwater a signed voucher request for each payment made. Woodworth frequently personally delivered the voucher requests to Bear Flag.

Woodworth was aware of the payments made to Porter but made no complaint to Bear Flag or any of the respondents. Woodworth also knew that a number of companies controlled or owned by Jess were performing the required subcontract work described in the lot cost sheet.

In April 1960, Woodworth agreed to refrain from seeking further advice or counsel from Moskowitz, as Jess and his attorney continually complained that Moskowitz continued to "preach suspicion" to him and was a bad influence on Woodworth. On April 29, 1960, the Atwater directors met and authorized Woodworth, as vice president, to sign, on behalf of Atwater, an agreement with Columbus Investment Company[7] (of which Jess was president) for the purchase by Atwater of $50,000 of promissory notes and second deeds of trust. Woodworth signed his approval of the minutes and executed the agreement on behalf of Atwater. On May 18, 1960, the Atwater directors again met and Woodworth signed his approval of the minutes which provided that all of the past acts of Jess had been approved and ratified.

From April 15, 1960, until October 10, 1960, Woodworth drew a weekly salary of $100 as an employee of Atwater Investment Company (a total of $3,583.50). He also received $100 a week until April 1961, as an employee of Columbus Investment Company.

On November 16, 1960, Woodworth signed his approval of minutes, including a resolution ratifying all acts taken by the officers for and on behalf of the corporation since the May meeting. In January 1961, the shareholders of Atwater met and adopted a resolution that Woodworth also approved in writing, again ratifying, confirming and approving all of the acts of the officers. On April 17, 1961, the Atwater directors met again and ratified the assignment by Jess of certain escrow funds from Atwater to its creditors. Woodworth approved these minutes and the resolution in writing.

On May 4, 1961, Woodworth for the first time took action to protect his interests. On that date, he instructed respondent, Redwood Empire Title Company (substituted as trustee under the deed of trust from Atwater to Woodworth) to record a notice of default[8] as Atwater failed to complete interest payments current on construction loans and failed to pay Porter second deeds of trust when due, thereby endangering the security of his deed of trust. On June 1, 1961, Woodworth, by written instructions, canceled his May 4 instructions to respondent, Redwood Empire, and again recognized the priority of the deeds of trust held by the savings and

---

[7]This loan was in connection with another subdivision; Woodworth also received a salary from Columbus Investment Company.

[8]The notice of default was recorded on May 8, 1961.

loan respondents. Woodworth also instructed Redwood Empire to release for payment to the savings and loan respondents the surplus realized on the closing of one house. On September 22, 1961, the Atwater directors met and a majority authorized Jess to file a bankruptcy petition; Woodworth opposed the resolution. In July 1961, Woodworth filed a separate action against Jess and Atwater for damages and lost profits.[9] Woodworth filed the instant action in 1962; the matter was tried in 1967.

The trial court found: at the time of the execution of the agreements of August 19, 1959, Woodworth knew and understood that: 1) neither Jess nor Atwater had the funds to pay for the installation of the off-site improvements required by the City of Petaluma as a condition of the permit; 2) money for the construction of such off-site improvements would necessarily be borrowed from sources other than the banking institutions, building and loan associations, federal or state savings and loan associations and life insurance companies specified as the source of construction loans by the subordination clause. These loans for off-site improvements would be secured by first deeds of trust, to which Woodworth would be required to subordinate his deed of trust; 3) the loans for off-site improvements would be obtained from one John Barnes, individually or doing business as John H. Barnes, Inc., or Porter Trust Deed Investment Company. Neither of these loan sources was the type of lending institution specified by the automatic subordination clause as the source of construction loans; 4) any loans obtained from Barnes or Porter would require the payment by Atwater of above-average interest rates, loan discount fees and compensation for services rendered by Barnes in obtaining the loans; 5) money for the construction of homes and other on-site improvements would be borrowed from various savings and loan associations. The construction loans would be secured by deeds of trust to which Woodworth would also be required to subordinate his deed of trust from Atwater; 6) the amounts of loans to be secured by deeds of trust covering the real property pursuant to the automatic subordination clause, together with the terms of repayment, interest rates and all other charges to be paid by Atwater, would be determined by agreement between Jess and the respective lenders; 7) at all times from and after August 19, 1959, Woodworth knew of the source of all moneys loaned to Atwater and secured by deeds of trust covering the real property and the cost and terms of repayment of these loans.

Woodworth made no inquiry as to the status, qualification or financial condition of Barnes or Porter, nor did he inquire as to the amounts,

---

[9]At all times here pertinent, Woodworth's action against Jess and Atwater was still pending.

probable cost or terms of repayment of loans to be obtained from any of them. Atwater borrowed about $38,000 from Porter on security of deeds of trust covering the real property. These funds were used for off-site subdivision improvements to the real property.

At all times from and after August 29, 1959, Jess was authorized, by a valid directors' resolution, on behalf of Atwater, to execute any and all documents necessary, convenient or proper to the subdivision, development and sale of the property. Woodworth knew of and consented to such authority. At all times, Woodworth knew the proposed and actual manner of disbursement of the proceeds of loans secured by deeds of trust covering the real property, or information as to such proposed and actual manner of disbursement was available to him, on reasonable inquiry. Woodworth made no inquiry as to such proposed and actual manner of disbursement.

Prior to the completion of disbursement of the proceeds of loans by the savings and loan respondents, Woodworth knew the amounts, terms and conditions of each loan or had available information as to amounts, terms and conditions, but made no inquiry. At no time prior to the commencement of this action (1962) did Woodworth complain to or notify any of the respondents that the terms and conditions of any loans secured by a deed of trust did not conform to the requirements of the automatic subordination clause of his deed of trust, or that the proposed or actual disbursement of the proceeds of loans did not comply with the requirements of the automatic subordination clause.

All moneys borrowed by Atwater from the savings and loan respondents were used in accordance with the terms and conditions of the automatic subordination clause, and disbursed through Bear Flag Builders Control in accordance with the instructions from Atwater. Woodworth was aware of and approved these instructions. The savings and loan respondents did not know the specific amounts and recipients of disbursements of their respective loans.

The savings and loan respondents were induced to make their respective loans of construction funds to Atwater in reliance upon the automatic subordination clause and would not have made these loans but for the inclusion of this clause. The title company respondents were induced to issue their respective policies of title insurance to the savings and loan respondents in reliance upon the automatic subordination clause and would not have issued their policies without that clause.

The title company respondents entered into no agreement with Woodworth, express or implied, to maintain any legal priority of Woodworth's deeds of trust with respect to any other prior or subsequent encumbrance

upon said real property; advise, supervise, seek to control, or report to Woodworth in any way the manner of disbursement of any funds by Atwater; advise, report to Woodworth, or seek to control, in any way, the source of loans obtained by Atwater on the security of the real property, whether with respect to the sources described in the subordination agreement or otherwise; or make any inquiry, legal or otherwise, into the validity or enforceability of the subordination agreement. The title company respondents had no knowlege of the manner of disbursement of any funds borrowed by Atwater on the security of the real property, except as to such disbursements of funds received and disbursed by each. As to all of these disbursements, the title company respondents complied with instructions from and agreements with Atwater and Woodworth.

The trial court concluded that: 1) the automatic subordination clause in the deed of trust from Atwater to Woodworth was legally sufficient, valid and enforceable against Woodworth; 2) the borrowing of funds by Atwater from Porter did not affect the rights of the savings and loan respondents to assert the priority of their respective deeds of trust over Woodworth's deed of trust in accordance with the automatic subordination clause; 3) by the recording of their respective deeds of trust from Atwater, each of the savings and loan respondents acquired a lien in and to the real property described, prior in right to the lien of Woodworth's deed of trust, and the foreclosure by the savings and loan respondents extinguished Woodworth's lien; 4) neither the savings and loan respondents nor the title company respondents owed a duty to Woodworth to assure application of loan proceeds to the uses described in the automatic subordination clause; 5) respondent, Sonoma Title, owed no duty to Woodworth to insure that funds borrowed by Atwater on the security of the real property or otherwise were borrowed from sources described in the automatic subordination clause; 6) the title company respondents owed no duty to Woodworth to maintain or assure any priority of his deed of trust; 7) Woodworth was estopped to assert against any of the respondents any claim that any loans secured by deeds of trust on said real property were not obtained from a source specified in the automatic subordination clause; Woodworth was likewise estopped from asserting against the savings and loan respondents that the proceeds of any loans secured by deed of trust from Atwater to them were not applied in accordance with the terms and conditions of the automatic subordination clause.

■ We turn first to Woodworth's contention that the automatic subordination clause in his deed of trust from Atwater was void for vagueness as it did not spell out the maximum amount of the construction loans and the maximum interest rate. Woodworth relies on *Middlebrook-Anderson Co. v. Southwest Sav. & Loan Assn.,* 18 Cal.App.3d 1023 [96 Cal.Rptr.

338] (petition for hg. den. Sept. 22, 1971). We agree that *Middlebrook* effectively abolished the distinction and confusion (created by previous case law) in holding that the principles of fair dealing set forth in *Handy* v. *Gordon,* 65 Cal.2d 578 at page 581 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848],[10] and *Stockwell* v. *Lindeman,* 229 Cal.App.2d 750 [40 Cal.Rptr. 555],[11] apply to executed as well as executory subordination clauses.

It does not follow, however, that an application of these cases to the particular facts of the instant case must result in a reversal in favor of Woodworth. Woodworth was not the usual seller. He owned one-third of the stock and was a director and officer of the buyer, Atwater. As a director and officer of Atwater, Woodworth participated in all of the transactions and signed the necessary documents. He also collected a salary from Atwater.

The uncontroverted evidence here indicated that the subordination clause was drafted by Woodworth's attorney, who represented him in the negotiations between the time of the oral agreement and the written agreements executed in August 1959. Woodworth and his attorney must have known that subordination agreements are in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the "know-how" and the purchaser's lending agency the capital for the mutually beneficial purpose of developing the land and disposing of it (usually by sale) to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill. In effect, as here, the vendor assists in the financing of the purchaser's development and becomes a quasi-joint venturer in the project. The safety of the vendor's investment depends upon the success of the development for as soon as the new lien is imposed on the property to secure the construction loan, the property is overencum-

---

[10]"Although the parties to a contract of sale containing a subordination clause may delegate to the vendee or third party lenders power to determine the details of subordinating loans, an enforceable subordination clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security. [Citations.] Such terms may include limits on the use to which the proceeds may be put to insure that their use will improve the value of the land, maximum amounts so that the loans will not exceed the contemplated value of the improvements they finance, requirements that the loans do not exceed some specified percentage of the construction cost or value of the property as improved, specified amounts per square foot of construction, or other limits designed to protect the security. Without some such terms, however, the seller is forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price."

[11]The court indicated, at page 758, that the maximum amount of the construction loan and the maximum interest rate that directly affect the security for repayment of a subordinated purchase money trust deed were "material" terms.

bered and the total liens exceed the value of the property until the improvements are completed (Miller, Starr & Regalia, *Subordination Agreements in California,* 13 U.C.L.A. L.Rev. 1298, 1299). Here, both Moskowitz and Woodworth, a licensed real estate salesman,[12] knew prior to the execution of the August 19 agreements that neither Jess nor Atwater had the money or any commitment for the needed off-site improvements and that the financing for these improvements would be obtained through Barnes and Porter at the high cost of 10 percent and points. However, Woodworth was ready to sign anything to obtain the needed moneys as he did not want to lose the anticipated profits from the sale of his property to Atwater. He anticipated greater profits from the sale to a corporation in which he had an interest than from a direct sale.

The interpretation of the general and all inclusive language of the subordination clause restricting the use of the loan funds to construction and subdivision improvement purposes is governed by the intent of the parties at the time of the drafting of the subordination clause (*Collins* v. *Home Savings & Loan Assn.,* 205 Cal.App.2d 86 [22 Cal.Rptr. 817]). The language of the subordination clause was negotiated and approved by Woodworth's attorney Moskowitz and no qualifying language inserted. Nor is there any evidence that Woodworth intended to qualify the language in any manner. After many years of proceedings to subdivide his property, Woodworth sought out and contacted Jess because of his experience and knowledge of subdivisions. Jess warned Woodworth that Porter was going to want a lot of points for its loans for the off-site improvements. Woodworth made no objection as he knew that the off-site improvements had to be financed before Atwater could obtain any construction loans. Woodworth knew that Jess did not have the money for the off-site improvements and that without the Porter financing, the whole deal would fall through. We hold that because Woodworth himself participated in the original discussions that led to the oral agreement and was then represented by his counsel in the subsequent negotiations that led to the written agreements, Woodworth cannot now argue that the subordination clause in his deed of trust from Atwater is unenforceable on the ground that it is void for vagueness.

■ Woodworth next asserts that under *Middlebrook, supra,* the trial

---

[12]Woodworth attempts to argue that the evidence does not support the trial court's finding in this respect, but Woodworth so testified on direct. In any event, Woodworth's seven years of work relating to the subdivision of his property would lead to some familiarity with subordination agreements as a method of financing such a large subdivision. He stated he assumed "they were in for" $358,000 for off-site improvements and $357,000 for construction.

court erred in concluding that the savings and loan respondents owed him no duty to protect his interest as a seller and that he was estopped from asserting either that any loans secured by a deed of trust were obtained from a source not specified in the automatic subordination clause or that the construction loan funds were not disbursed according to the requirements of the subordination clause.

In *Middlebrook, supra* (decided on a demurrer), the court held that on the facts there alleged, the priority acquired by the lender created by the seller's subordination agreement extended only to the money spent for construction purposes. The court also imposed on the lender an implied agreement to protect the seller's interest because of the lender's actual knowledge of the provisions of the seller's lien and subordination provision, and the lender's better position to control disbursements and protect both its own and the seller's interests.[13] Of course, the trial court did not have the benefit of the well-reasoned opinion in *Middlebrook*.

We are, therefore, presented with the question of whether Woodworth's dual role of buyer, with his interest in Atwater, and seller, as well as his knowledge and participation (directly or by his attorney) in the Barnes-Porter loans and construction loans and the disbursements made therefrom by Bear Flag, constituted a waiver of the responsibilities imposed on lenders in more usual fact situations involving independent sellers, buyers and developers by *Middlebrook*.

Woodworth here, pursuant to his agreement with Jess, the developer, became a one-third owner of the buyer, Atwater. Thus, Woodworth not

---

[13]The court noted at pages 1036 and 1037: "It has been pointed out by many courts and commentators that as between the seller and the lender, the lender is by far in the better position to control the use of the loan proceeds and thereby prevent misappropriations by the developer. The lender can require documented evidence that expenses have been incurred and can corroborate this by on-site inspections. It is common for lenders to control disbursements, since they, too, have an interest in preventing misuse of loan proceeds (see 52 Cal.L.Rev. 157-158, fn. 5). If the lender loses priority as a result of improper disbursements, it remains in a position to redeem the seller's purchase money lien and foreclose on the junior construction lien and thereby own the property for a price presumably less than the market value. Also, loan proceeds would be at least partially recouped by the improvements made. The seller, on the other hand, is normally not in a position to protect himself by redemption of the larger construction lien in the event the lender were to obtain priority. After redemption, the lender can obtain a deficiency judgment against the defaulting developer whereas the seller, holding a purchase money security interest, would be barred by Code of Civil Procedure section 580b, if he tried to recover a deficiency judgment against the developer. (*Kistler* v. *Vasi,* 71 Cal.2d 261, 263-264 [78 Cal.Rptr. 170, 455 P.2d 106].) The lender is in a far better position to absorb any loss since such contingencies may be provided for in its profit and loss estimates. Finally, allocation of the loss to the lender would encourage the parties to provide for the various contingencies by contract."

only subordinated his interest to aid the financing of the development (as in any subordination situation) but also acquired an interest in the buying corporation. In addition to this dual capacity resulting from his corporate ownership, Woodworth also became an officer and director of the buyer. As such, he had access to more information than an ordinary seller, and, in fact, directly participated in the many transactions relating to the negotiation of all of the loans and the disbursement of the loan proceeds. Woodworth's knowledge, participation and approval of the Barnes-Porter loans is detailed above. As an officer and director of Atwater, Woodworth actually signed some of the documents required to consummate the construction loans. He participated in the discussions with Bear Flag concerning disbursements and approved the third progress payment from which the final payments on the Barnes-Porter loans were made. We hold that so much active participation by a seller who is also a part-owner and officer and director of the buyer, and who repeatedly orally and in writing indicates his understanding of the subordination clause in his deed of trust, amounts to a waiver by the seller of the duties imposed by *Middlebrook* on a lender for the protection of the ordinary seller.

Woodworth asserts that, contrary to the findings and conclusions of the trial court, his knowledge and conduct do not meet the strict requirements for estoppel when the effect of the estoppel is to take title to land from him and vest it in the savings and loan respondents. He cites *City of Long Beach* v. *Mansell,* 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423], wherein the court noted at pages 489-491, that the doctrine of estoppel should not be applied to divest title to land unless the culpability of the party to be estopped is of a sufficient dimension that in addition to containing the ordinary elements of estoppel,[14] it also constitutes actual or constructive fraud.

The application of the strict standard of *Mansell* to the instant case is doubtful as Woodworth was not divested of his title by the trial court's finding, but by the foreclosure sales of the savings and loan respondents which extinguished his junior interest pursuant to the automatic subordination clause. Woodworth knew and understood the effect of this clause (that he signed after negotiations pursuant to his agreement with Jess) and affirmed the junior nature of his interest, in writing, on several occasions, and as late as June 1, 1961. We note that the trial court's finding on estoppel was also based on the automatic subordination clause. All of the steps taken by the title company respondents and disbursements made by the savings and loan respondents were made pursuant to written

---

[14] 1. Awareness of the facts by party to be estopped.
2. Unawareness by the other party.
3. Reliance and injury.

instructions from Woodworth's attorneys or on documents duly authorized and signed by Woodworth in his capacity as an officer of Atwater. Prior to the filing of this action in 1962, neither Woodworth nor his attorney ever indicated to any of the respondents that any funds were borrowed from sources not specified in the subordination clause[15] or disbursed in a manner inconsistent with the requirements of the clause.[16]

Besides Woodworth's affirmative approval of loan and disbursement procedures as indicated above, there were a number of occasions when Woodworth encountered problems with Jess,[17] but chose to go ahead in order to complete the deal and protect his anticipated profits. Clearly, Woodworth's over-all conduct met all of the traditional elements of estoppel.

■ Finally, citing *Jones* v. *Sacramento Sav. & Loan Assn.*, 248 Cal. App.2d 522 [56 Cal.Rptr. 741],[18] Woodworth maintains that to prevent unjust enrichment, he is entitled to the difference of $347,483 between the amounts collectively realized by the savings and loan respondents on the sales of the 199 homes (for $1,932,833.68) and the amounts of the original loans. Woodworth urges that the recovery of the savings and loan respondents should be limited to an equitable lien for the amount of their construction loans, less the amount previously repaid.

In *Jones,* the owner of 13 lots of residential property gave purchase money trust deeds containing subordination provisions for the construction loans made by Sacramento Savings and Loan. After the homes were built, both loans became delinquent and Jones acquired the purchase money notes at a discount, held trustee sales, and purchased the properties. Sacramento Savings and Loan, relying on its subordination clause, ignored Jones' sale, conducted its own sale and purchased the properties. Jones sued to quiet title. The court held that: 1) the savings and loan lost its

[15]As paragraph I of the affirmative defenses in the answer of the savings and loan respondents admitted that all of them were organized and existing under the laws of this state, there was no dispute as to their status as qualified lenders under the subordination clause. Woodworth's contention is limited to the Barnes-Porter loans.

[16]In addition to the items discussed elsewhere, Woodworth lists the points and loan fees charged by the savings and loan respondents, brokerage fees and other costs of financing that were either anticipated or expected by him, or authorized on the lot cost sheets that he approved, or on voucher requests approved by Atwater.

[17]The first was the non-existence of financing for off-site improvements prior to the signing of the agreements. This was followed in October 1959, by Jess' apparently unauthorized withdrawal of funds from the title companies; in March 1960, by Jess' conduct toward Woodworth at the ground breaking and Jess' subsequent demand that Woodworth stop seeing Moskowitz.

[18]This contention is raised for the first time in the closing brief.

priority as it had departed substantially from the conditions specified in the subordination clause; 2) Jones was, therefore, entitled to priority, but would be unjustly enriched if his trustee's sale wiped out the construction loans. Jones had purchased the $800 per lot purchase money notes at a discount; the construction loans amounted to $11,000-$12,000 per lot. Thus, the savings and loan, mistakenly relying on its expected priority, stood to lose $143,000 while Jones, with knowledge of the facts, acquired improved property at a fraction of its value; 3) accordingly, the savings and loan was entitled to an equitable lien to the extent of its construction loans, to be paid off, as each home was resold, in a manner to be determined by the lower court to avoid undue hardship to Jones.

Woodworth's reliance on the *Jones* case is based on two misconceptions: first, that he is in the same position as Jones;[19] second, that the savings and loan respondents here lost the priority of their liens created by the subordination clause. As the savings and loan respondents here retained their lien priority, by the foreclosure sale they acquired title, including Woodworth's interest. Accordingly, they are entitled to retain the entire amount of $347,483 realized on the subsequent sale of the homes.

Finally Woodworth contends that the title company respondents were liable for negligence as they failed to dispense the funds in their hands in accordance with the terms of the subordination clause, and he is entitled to his attorney's fees in this action. However, the trial court's conclusion is supported by *Weiss* v. *Brentwood Sav. & Loan Assn.,* 4 Cal.App.3d 738, 744 [84 Cal.Rptr. 736]. There, as here, the borrower sought to impose on one, not party to the transaction culminating in the subordination agreement, a duty of care. Similarly here, from the record before us, we are unable to find that the title company respondents owed any duty of care to Woodworth or that they breached any duty.

Woodworth, citing *Ruth* v. *Lytton Sav. & Loan Assn.,* 266 Cal.App.2d 831 [72 Cal.Rptr. 521], further argues that the title company respondents were "trustees." ■ It is well established, however, that a trustee under a deed of trust is not a trustee in the technical sense. Rather, he is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow and bears a fiduciary relationship to each of them. His obligation to each is measured by an application of the ordinary principles of agency. ■ It is the duty of an escrow holder to comply strictly with the instructions of his principal and to exercise

---

[19]Woodworth's position would be analogous to that of Jones if Woodworth had here exercised his power of sale or bought in at the foreclosure sale.

ordinary skill and diligence in his employment (*Ruth* v. *Lytton, supra; Spaziani* v. *Millar,* 215 Cal.App.2d 667, 682-683 [30 Cal.Rptr. 658]). The record here supports the findings that the title company disbursements were made in accordance with the instructions from and agreements with Atwater and Woodworth.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 16, 1972.