In re SUNSET BAY ASSOCIATES, a California joint venture, Debtor.

Richard J. PLASTINO, Janice Gudde Plastino; Doris L. Brown, Plaintiffs-Appellants,

v.

EUREKA FEDERAL SAVINGS AND LOAN ASSOCIATION, et al., Defendant,

and

Allan Jamieson, Defendant-Appellee.

Richard J. PLASTINO; Janice Gudde Plastino; Doris L. Brown, Plaintiffs-Appellants,

v.

EUREKA FEDERAL SAVINGS & LOAN ASSOCIATION, et al., Defendant-Appellee.

Nos. 89–55705, 89–55707.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1990.

Decided Sept. 24, 1991.

Paul R. Pearlson, Cameron, Madden, Pearlson, Noblin and Sellars, Long Beach, Cal., for plaintiffs-appellants.

John A. Graham, Frandzel & Share, Los Angeles, Cal., for defendant-appellee, Eureka Federal Sav. & Loan Ass'n.

June D. Beltran, Khourie, Crew & Jaeger, P.C., San Francisco, Cal., for defendant-appellee, Allan Jamieson.

Before PREGERSON, REINHARDT and HALL, Circuit Judges.

REINHARDT, Circuit Judge:

Plaintiffs Richard J. Plastino, Janice Gudde Plastino and Doris L. Brown ("Plastino/Brown") appeal the district court's entry of summary judgment in favor of defendants Allan Jamieson and Eureka Savings and Loan Association ("Eureka") on Plastino/Brown's claims for declaratory relief and damages. We reverse and remand.

## BACKGROUND

Because many of the issues raised on this appeal involve disputes over what factual inferences the evidence in the record supports, we begin by sketching only the undisputed facts. In June, 1983, Plastino/Brown agreed to sell realty to a joint venture known as Sunset Bay Associates ("Sunset") for the purpose of building a residential condominium project. In exchange for the property, Plastino/Brown received approximately $2.4 million in cash and a deed of trust secured by the property in the amount of $1.4 million.

Also in June, 1983, Sunset obtained financing for the project by signing a construction loan agreement with Eureka. Eureka was the principal lender of a group of 14 lenders. At that time, Allan Jamieson was Eureka's Chief Lending Officer and supervised Eureka employees who oversaw the construction funding on the project. Sunset's promissory note for $33 million was also secured by a deed of trust against the property.

There is no dispute as to the order of the recording of the deeds held by Plastino/Brown and Eureka. Both deeds were recorded on June 22, 1983: Eureka's was recorded first, and Plastino/Brown's second. There is also no dispute that both parties knew at the time of recording that Plastino/Brown were recording after Eure-

ka for the purpose of making Eureka's lien senior to Plastino/Brown's lien.

The promissory note that Plastino/Brown received from Sunset and a rider to its deed of trust each contained a section titled "Construction Loan." Both the deed rider and the note stated that "loan fees" on the project could not exceed two points, that the loan funds had to be used exclusively for the project, and that Eureka was not obligated to "ensure the proper application or use of Construction Loan funds."[1] The parties dispute whether the record shows that Eureka knew of these terms before the filing of the Plastino/Brown deed.

Between June, 1983 and February, 1986, Eureka disbursed approximately $31 million under the loan. The parties dispute whether all of this money was properly applied to the project or whether, as Plastino/Brown contend, Jamieson and Eureka diverted up to $4.7 million to other recipients. The parties also dispute whether the "loan fees" for the project exceeded the two point limit.

For reasons that are not material to the resolution of this appeal, Sunset failed to complete the project on schedule or within budget. It defaulted and filed for bankruptcy before Eureka could foreclose. In August, 1987, the Bankruptcy Court approved a sale of the property to a realty company for $23.7 million.

## PROCEEDINGS BELOW

Sunset filed its bankruptcy petition on December 26, 1985. On April 25, 1986, Plastino/Brown filed an amended complaint against Eureka, Jamieson, and several other defendants.[2] The complaint against Eureka included five claims for relief. Plastino/Brown sought a declaratory judgment that their lien is superior to Eureka's; a quiet title judgment to the same effect; money damages for two claims of intentional misrepresentation and conspiracy to commit fraud; and money damages for one claim of negligent misrepresentation. The complaint against Jamieson sought relief on the intentional misrepresentation claims.

After the parties had completed discovery, the Bankruptcy Court heard cross-motions for summary judgment by Plastino/Brown, Eureka, and Jamieson on January 31, 1989. Because this is a non-core bankruptcy proceeding, the bankruptcy judge prepared a report and recommendation in which he made findings of fact and conclusions of law. See 11 U.S.C. § 105 (1988); 28 U.S.C. § 1334 (1988); 28 U.S.C. §§ 157(a), (b)(2)(K) and (C) (1988). He recommended granting the defendants' summary judgment motions and denying Plastino/Brown's summary judgment motions on all of Plastino/Brown's claims. The United States District Court for the Central District of California adopted the findings of the Bankruptcy Court. This appeal fol-

1. The language of the two documents was identical except for the terms used to designate the parties. In pertinent part, the Construction Loan section of the rider to the deed of trust provided:

Beneficiary [Plastino/Brown] acknowledges that the Trustor [Sunset] intends to construct a one hundred sixteen (116) unit residential condominium project ("Project") on the Property. To enable the Trustor to obtain construction financing ("Construction Loan") for the Project and, as a material inducement to the Trustor to purchase the Property from Beneficiary, Beneficiary has agreed, subject to the following conditions, that the Trust Deed will be recorded subsequent to the recording of the deed of trust ("Construction Trust Deed") securing repayment of the Construction Loan, and that Beneficiary's Trust Deed shall at all times be subordinate in priority to the Construction Trust Deed....

(d) Loan fees shall not exceed two (2) points....

(g) The Construction Loan funds shall be used exclusively for direct and indirect costs, fees, and expenses of the Trustor in acquiring, financing, and marketing the improvements located thereon. Beneficiary acknowledges that the Construction Lender, in making disbursements pursuant to any Construction Loan agreement, will be under no obligation or duty, nor will the Construction Lender represent that it will ensure the proper application of Construction Loan funds. Any application or use of Construction Loan funds, for purposes other than those provided for in the Construction Loan agreement, shall not defeat, alter, or invalidate the lien of the Construction Trust Deed in whole or in part.

2. The claims against the other defendants are not involved in this appeal.

lowed.[3]

## STANDARD OF REVIEW AND APPLICABLE LAW

■ We review the grant of a summary judgment motion de novo. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989) *cert. denied,* —— U.S. ——, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). In order to uphold the grant of summary judgment on each claim we must find that there is no genuine issue of material fact which precludes a finding for the appellant on that claim. *See Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987).

■ California law provides the rules of decision for determining the parties' substantive rights. *See* 11 U.S.C. § 510(a) (1988) (providing for enforcement of subordination agreements "to the same extent [as] applicable nonbankruptcy law"). Federal law governs the admissibility of evidence for purposes of summary judgment pursuant to Fed.R.Civ.P. 56(e). *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.1988) (stating that admissibility of evidence is governed by Federal Rules of Evidence even where state law provides the substantive rule of decision).

## DISCUSSION

### I. *The Relative Priority of the Liens*

■ Plastino/Brown argue that summary judgment was improper with respect to their first two causes of action against Eureka because, viewed in the light most favorable to Plastino/Brown, the evidence supports inferences that: (A) Eureka's lien was senior to Plastino/Brown's only if certain conditions in Plastino/Brown's deed rider and note were met; (B) those conditions were violated; and (C) as a result of the violation, Eureka's lien is not merely reduced to the extent of the violation, but is rendered entirely subordinate to Plastino/Brown's. In order for us to reverse we must find that the evidence could support

each of these inferences. We address these issues in turn.

**A. Whether the Priority of Eureka's Lien was Contingent Upon Compliance with the Terms of Plastino/Brown's Deed Rider and Note**

Under California law, a purchase money deed of trust "has priority over all other liens created against the purchaser, subject to the operation of the recording laws." Cal.Civ.Code § 2898(a) (West Supp.1991). The recording laws mandate that the first recorded deed of trust on real property is superior to subsequently recorded deeds. Cal.Civ.Code § 1214 (West Supp.1991). Typically, a lender will not provide funds to a developer without assurance that his lien will be senior to any lien given to the seller. Taken together, sections 1214 and 2898(a) provide a simple mechanism to subordinate the seller's lien to the lender's: as happened in this case, the seller agrees to record his deed after the lender's deed is recorded, thus making the lender's lien superior to the seller's. The seller willingly subordinates his lien because he knows that absent such subordination, the developer would be unable to obtain financing, and therefore unwilling to purchase the property. We shall refer to this arrangement as a "subordination by subsequent recording."

In *Middlebrook–Anderson Co. v. Southwest Savings and Loan Assoc.*, 18 Cal. App.3d 1023, 1029, 96 Cal.Rptr. 338, 341 (1971), the California Court of Appeals held that such an arrangement is in substance a subordination agreement, so "that the duties owed by a lender to a seller under a formal subordination agreement do not differ from the duties owed by a lender to a seller when the lender obtains priority over the seller under an agreement by the seller to record after the lender." In that case, the seller stated a valid cause of action for violation of the provisions of a subordination by subsequent recording where he alleged that the lender had "actual knowledge of the provisions of the seller's lien in

---

**3.** Plastino/Brown have appealed the district court's grant of summary judgment with respect to every claim except for the negligent misrepresentation claim against Eureka.

general, and of the subordination therein in particular." *Id.* at 1037, 96 Cal.Rptr. at 347. It is therefore clear that if Eureka had actual knowledge of the terms of the Plastino/Brown deed rider and note, the priority of Eureka's lien would depend upon compliance with those terms.

### 1. *Actual Knowledge*

Eureka contends that there is no evidence in the record from which it could be inferred that it had actual knowledge of the terms of the Plastino/Brown deed rider and note. We disagree. First, although Jamieson did not recall discussing the actual terms of the Plastino/Brown deed rider and note, he stated in his deposition that Eureka "required a specific subordination agreement as a condition of financing." [4] The reference to a *specific* subordination agreement could imply that Eureka required the particular subordination agreement that ended up in the Plastino/Brown deed rider and note. This inference draws support from the fact that although the note Plastino/Brown received from Sunset affected Plastino/Brown's rights as against Sunset, it also contained a term that protected Eureka's interests—i.e., the disclaimer absolving Eureka of any obligation to ensure the proper application of loan funds. *See supra,* n. 1. Because this term benefits Eureka, it is reasonable to infer that it may have been included at the request of someone at Eureka, regardless of whether Jamieson was aware of it. [5]

In addition, Plastino/Brown contend that the deposition of Thomas Ginella, president of Baywood Equities—which is one of the joint venturers comprising Sunset—provides further evidence that Eureka knew of the terms of the Plastino/Brown deed rider and note before the deed was recorded. Before assessing Ginella's testimony, however, we must decide whether it is part of the record. Eureka contends that Ginella's deposition testimony is inadmissible because it was neither completed nor signed. Eureka argues that it was thereby denied its opportunity for cross-examination, and further, that the unsigned deposition is unreliable.

In *Hoover v. Switlik Parachute Co.,* 663 F.2d 964 (9th Cir.1981), we held that deposition testimony that had not been subject to cross-examination by the party opposing its introduction could be used to support (or oppose) a summary judgment motion if it met the requirements for an affidavit, i.e., if the depositions "were made on personal knowledge and set forth facts that were admissible in evidence." *Id.* at 966. *See* Fed.R.Civ.P. 56(e). *Hoover* is controlling here except to the extent that it does not address the question whether an uncompleted deposition that is also *not signed* is admissible as an affidavit. Neither party has cited any case addressing this question, nor have we been able to find any. [6] How-

---

**4.** The following exchange took place during the Jamieson deposition:

Q. Do you remember any discussion that you had with Mr. Ginella about subordination?

A. Other than the fact that there would be a subordination, no.

Q. Do you know whether or not anyone at Eureka ever [agreed to] that subordinate financing?

....

A. We at Eureka were all aware of it. We required a specific subordination agreement as a condition of financing.

**5.** Although the dissent suggests that this permissible inference is refuted by other evidence which supports a contrary conclusion, *see* dissent at 1521–22, this evidentiary dispute is more properly evaluated at trial than on a motion for summary judgment. The dissent's attempt to characterize the contrary evidence as "undisput-

ed background or contextual facts," *see id.,* mischaracterizes the nature of that evidence and fails to refute the existence of a genuine issue of material fact concerning Eureka's knowledge of the terms of the subordination agreement.

**6.** Eureka cites two cases dealing with the admissibility of deposition transcripts at *trial, United States v. Kapnison,* 743 F.2d 1450, 1458 (10th Cir.1984); *United States v. Morlang,* 531 F.2d 183, 190 (3d Cir.1975), and one case holding a transcript inadmissible because it contained hearsay. *Lehnert v. The Ferris Faculty Association,* 556 F.Supp. 309, 315 (W.D.Mich.1982). Jamieson cites *Cummings v. Roberts,* 628 F.2d 1065 (8th Cir.1980) for the proposition that an unsworn affidavit cannot be considered in deciding a summary judgment motion. *Cummings* actually held that *uncertified documents* attached in support of an otherwise admissible affidavit are inadmissible. *Id.* at 1068. None of

ever, the logic of *Hoover* implies that an unsigned deposition should be admissible where, as here, the deponent was *sworn.* The approach of *Hoover* is pragmatic, looking to see if the deposition testimony is at least as reliable as an admissible affidavit. Because there is no reason to believe that the sworn answers to questions are less reliable than an affidavit, to the extent that the content of the deposition testimony is otherwise admissible, that testimony should be admissible on summary judgment. *See* Fed.R.Civ.P. 56(e). We hold that it is. Accordingly, we may consider Ginella's deposition testimony.

▉ When asked when he delivered a copy of the Plastino/Brown promissory note to Eureka, Ginella responded, "[s]ometime prior. Three months prior to the time that we closed the construction loan. A month or two after we closed." This testimony is hardly a model of clarity. However, our function is not "to weigh the evidence," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), but to view the record evidence in the light most favorable to the parties opposing summary judgment. *See Nillson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1542 (9th Cir.1988). Ginella's response to when the note was delivered could be read as if a comma appeared immediately before the second "we closed." The purport of his statement would then be as follows: "[The note was delivered] sometime prior—three months prior to the time that we closed the construction loan. A month or two after [the delivery of the note] we closed." However one reads the statement there is some conflict between the "three months" statement and the "month or two" assertion. This apparent inconsistency can be explained if we as-

sume that Ginella was thinking aloud. He initially states that the note was delivered "sometime" prior to the closing. He then estimates that time as "three months." After thinking about the events some more he revises his estimate to "two or three months." Of course there are other ways to read Ginella's statement, but for purposes of summary judgment, we must conclude that it supports Plastino/Brown's contention that a copy of the note was delivered to Eureka before Eureka's deed was recorded.

Finally, Paul R. Pearlson, attorney for Plastino/Brown stated in a declaration that pursuant to formal discovery in this case, he saw a copy of the Plastino/Brown note in a Eureka file. Eureka acknowledged in an answer to an interrogatory that the file contained the copy of the note. Eureka also acknowledged that the same file contained a copy of the deed and rider with the recording stamp already on the deed. Eureka therefore points out that the *deed* could have been received after it was recorded. On this point, Eureka is certainly correct. However, according to Pearlson, the copy of the *note* did not indicate when it was received. It could have arrived with the deed, or, as Ginella apparently stated, it could have arrived before the deed was recorded. Because we are required to draw the inference most favorable to Plastino/Brown, we view the evidence as supporting the conclusion that Eureka received notice of the terms of Plastino/Brown's subordination agreement before the deed was recorded, and therefore was obligated not to violate those terms.[7] The grant of summary judgment cannot be sustained where, as here, a genuine issue of material fact exists concerning Eureka's actual prior knowledge of the terms of the subordination agreement.

these cases addresses the issue we must decide here.

7. The parties disagree over whether Plastino/Brown would bear the burden of proving Eureka's knowledge of the terms of the deed rider at trial or whether Eureka would bear the burden of proving lack of knowledge. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (party that

bears persuasion burden at trial bears burden of establishing that no record evidence supports or precludes the grant of summary judgment). However, we need not decide where the burden lies, because we find that even if Plastino/Brown bear the burden of proving Eureka's knowledge, they have introduced sufficient evidence to raise a genuine issue of material fact with respect to that question.

Our determination that Plastino/Brown have introduced sufficient evidence of Eureka's actual knowledge to defeat a summary judgment motion does not, of course, imply that Plastino/Brown will necessarily prevail on this issue at trial. After a trial, the finder of fact might well be justified in concluding the opposite. Accordingly, we rest our decision on an alternate holding as well. We hold that the district court erred in its conclusion that, under *Middlebrook–Anderson*, a lender must have actual knowledge of the conditions of a seller's subordination by subsequent recording in order for the priority of its lien to be contingent upon those conditions being met. We conclude, to the contrary, for reasons we explain below, that constructive knowledge is sufficient. Thus, the presence of a genuine issue of material fact concerning Eureka's actual knowledge of these conditions is a sufficient but not a necessary defense to summary judgment; so long as the lender has advance knowledge of the *fact* that the seller intends to subordinate by subsequent recording, the priority of the lender's lien is contingent upon compliance with the terms of the subordination agreement. Accordingly, in order to defeat summary judgment, Plastino/Brown need only raise a genuine issue of material fact as to Eureka's *constructive* knowledge of the terms of the subordination agreement—i.e., as to Eureka's knowledge of the *fact* of subordination.

### 2. *Constructive Knowledge or Actual Knowledge*

■ We begin by observing that neither *Middlebrook–Anderson* nor any subsequent California case has addressed the question whether actual knowledge of the provisions of the seller's lien is required for the lender's lien to be contingent upon compliance with those conditions, or whether the lender need only know that the seller has subordinated his lien by recording second. We must therefore attempt to predict, based upon *Middlebrook–Anderson*

and the other California cases, as well as general principles of law, what rule California would adopt.[8]

Eureka's first argument is textual, calling our attention to the following language in *Middlebrook–Anderson:* "An implied agreement in the instant case can and, in equity, should be spelled out from [the] lender's alleged *actual knowledge* of the provisions of the seller's lien in general, and *of the subordination therein* in particular." 18 Cal.App.3d at 1037, 96 Cal.Rptr. at 347 (emphasis added). Furthermore, a California court subsequently characterized the lender's duties under *Middlebrook–Anderson* as arising because the lender "knew of the seller's security interest and knew that the seller's lien was subordinated only on condition that loan funds were to be used just for construction purposes." *Gluskin v. Atlantic Sav. & Loan Ass'n,* 32 Cal.App.3d 307, 314, 108 Cal.Rptr. 318, 322 (1973). However, contrary to Eureka's contention, this language states only what we already know—that in *Middlebrook–Anderson* the lender had actual knowledge of the terms of a subordination agreement, and that such knowledge is a *sufficient* condition for binding it. The California cases do not tell us whether such knowledge is a *necessary* condition.

■ Eureka also contends that we should not hold it responsible for knowing what conditions were in Plastino/Brown's deed because at the time of the subordination Eureka may have reasonably believed that it was under no obligation to discover those conditions. However, whatever rule we apply will result in some unfairness to one of the parties. The question whether constructive knowledge of the terms of a deed subordinated by subsequent recording is sufficient to bind the lender is, after all, an *open* question under California law. Plastino/Brown no more knew that they would be required to obtain evidence of Eureka's actual knowledge of the terms of their deed than Eureka knew that they would be presumed to have constructive

---

**8.** Although the rationale of *Middlebrook–Anderson* has been criticized by commentators, *see* H. Miller & M. Starr, *Current Law of California Real Estate* § 8:166, at 651, § 8:167, at 655 n. 79 (2d ed. 1989), it remains the law of California.

knowledge. The fact that our holding has retroactive effects in this case does not provide a basis for preferring Eureka's claims to Plastino/Brown's.

We now turn to the question whether the California courts would bind a lender with knowledge only of the fact that the seller has entered into a subordination agreement. There are several reasons why we believe that they would. The first relates to the California policy of treating traditional subordination agreements and subordinations by subsequent recording identically. *See Middlebrook–Anderson*, 18 Cal. App.3d at 1029, 96 Cal.Rptr. at 341. Eureka acknowledges that in a traditional subordination agreement the seller's lien is subordinated only to the extent that the conditions in the subordination agreement are met—whether or not the lender has *actual* prior knowledge of those conditions. *See* 3 H. Miller & M. Starr, *Current Law of California Real Estate* § 8:166, at 647 (2d ed. 1989) ("Where the new lender has actual or *constructive knowledge* of the terms of the subordination and the new loan does not satisfy those terms, there is no alteration of priority") (emphasis added). To effectuate California's policy of identical treatment for subordination agreements and subordinations by subsequent recording, we should apply the same rule here.

Eureka argues, however, that the two kinds of subordination arrangements should be treated differently. It notes that when a subordination is accomplished by agreement, the reason that actual knowledge of the seller's terms is not required is that the lender has constructive notice of those terms from the public records. By contrast, in the case of a subordination by subsequent recording there is no public record of the terms of the seller's trust deed or its restrictions because the seller's deed is not recorded until after the lender's deed. Therefore, Eureka argues, it is inappropriate to bind the lender unless the lender has actual knowledge of the terms of the seller's trust deed.

We believe that Eureka's proffered distinction is not significant. In the traditional subordination situation, California law places a duty on the lender to consult the public records and discover the conditions upon which the seller has subordinated his lien. When a subordination is accomplished by subsequent recording, we believe that California law would place an analogous duty on the lender to consult a different source: the seller himself. Given the degree of cooperation between lender and seller that is necessary to effectuate a subordination by subsequent recording, this is a fairly simple matter. In order to coordinate the subsequent recording, the lender must have actual knowledge of the fact that the seller intends to subordinate. We may use this case as an example. Here, it is undisputed that the two deeds were recorded within minutes of each other. It is also undisputed that the reason for this was Eureka's requirement that Plastino/Brown's lien be subordinated to its own. A rule that presumes that under such circumstances the lender will ask to see a copy of the seller's deed imposes only a very slight burden on the lender—and certainly no greater burden than the current California rule, which presumes that the lender will consult the public records before signing a traditional subordination agreement.

In addition to serving the California policy of identical treatment for the two kinds of subordination arrangements, conditioning the priority of the lender's lien on compliance with the terms of the seller's trust deed where the lender has knowledge of the fact of subordination also furthers the California policy "to protect the seller in subordination situations...." *Middlebrook–Anderson*, 18 Cal.App.3d at 1036, 96 Cal.Rptr. at 346. The basis for this policy is the fact that the lender will generally be a large financial institution with access to expert legal advice, while sellers are usually less sophisticated. The lender is therefore in the better position to know its obligations, and less likely to permit an important right to be sacrificed through inadvertence.

Finally, although, as we have stated, the precise question we address here has not been previously decided by the California courts, one closely analogous case provides

considerable guidance. In *Radunich v. Basso*, 235 Cal.App.2d 826, 835, 45 Cal. Rptr. 824, 830 (1965), the seller was informed by the purchaser that his lien could only be subordinated to an improvement and construction loan deed. The purchaser then borrowed money from Basso to pay part of the original purchase price. Without the seller's knowledge, and in violation of their understanding, the purchaser then arranged to have Basso's lien recorded before the seller's. The court held that the seller's lien retained priority even though it was recorded second, and even though Basso may not have had actual knowledge of the terms of the agreement between the seller and the purchaser. The court stated:

> Basso knew that the loan he was making was to be used for the down payment on the property and not for improvements. This fact put him on notice and required him to investigate to determine if [the seller] agreed that the deed of trust Basso was buying should be a first lien.

*Id.*, 235 Cal.App.2d at 835, 45 Cal.Rptr. at 830. Hence, binding the lender to the terms of the seller's lien imposes a type of duty on the lender—a duty to investigate—that the California courts have previously approved.

Therefore, we conclude that under California law, when a seller subordinates his purchase money lien to a lender's lien by permitting the lender to record first, and the lender knows that the seller has agreed to record his deed second for the purpose of affecting a subordination, the priority of the lender's lien is contingent upon the fulfillment of any conditions stated in the seller's lien, whether or not the lender has actual knowledge of those conditions at the time the deeds are recorded. On remand Plastino/Brown need only prove that Eureka knew of the existence of the subordination arrangement in order to show that the priority of Eureka's lien was contingent on the conditions of Plastino/Brown's deed rider and note being met.

**B. Whether the Conditions of the Subordination Agreement Were Met**

The terms of the Plastino/Brown deed rider and note made the subordination contingent on two conditions. First, loan fees could not exceed two points. Second, construction loan funds had to be used exclusively for the project. Plastino/Brown contend that both of these conditions were violated. Because we find that there is a genuine issue of material fact with respect to the loan fees, we need only consider the first condition.[9]

The two point limit on construction loan fees meant that loan fees could not exceed two percent of $33 million, or $660,000. Plastino/Brown contend that loan fees actually totaled at least $1.38 million. They note that Jamieson stated in his deposition that Eureka's share of the loan fees amounted to $390,000. They then point to two June, 1983 memoranda from Eureka's files showing that: (1) $390,000 in "loan fees" were retained by Eureka, $360,000 of which was retained on its own account and $30,000 on another account, and (2) a total of $1,380,000 in "construction loan fees" were listed for the Sunset account. Plastino/Brown also point to Exhibit 31, an escrow closing statement for the project listing a "loan fee" of $360,000 for Eureka and a "Loan fee to Various lenders" of $1,020,000. In its answers to interrogatories, Eureka admitted the truth of the information contained in these documents. Thus, Plastino/Brown argue that the total construction loan fees were at least $1,380,000, and thus clearly in violation of the provisions of the deed of trust. Plastino/Brown contend further that brokers' fees, finders' fees, loan servicing fees, and permanent loan fees bring the total loan fees to $2,850,000.

█ Eureka argues that the escrow closing statement of Exhibit 31 was not authenticated in accordance with the rules

9. Although we need not consider the diversion question here, we note that the facts discussed below relating to Plastino/Brown's conspiracy to defraud claim against Eureka, *see infra,* part II(A), would in all likelihood also be sufficient to raise a genuine issue of material fact with respect to whether project funds were diverted in violation of the terms of the subordination conditions and with respect to Eureka's responsibility for such diversion.

of evidence, and that its hearsay contents are therefore inadmissible against Eureka. Under Fed.R.Civ.P. 56(e), material presented on summary judgment must be admissible under the rules of evidence. Eureka is thus correct that Plastino/Brown cannot introduce hearsay to defeat a summary judgment motion. However, Plastino/Brown did not rely on the hearsay of Exhibit 31, but rather on the admission by Eureka that Exhibit 31 contained truthful information. An admission is, of course, admissible in evidence. *American Title Ins. Co*, 861 F.2d at 226. Thus, we may consider the material in Exhibit 31. That document could reasonably be read to show that loan fees totaled as much as $1.38 million, far in excess of the two point limit. Moreover, Eureka does not challenge the two documents that it prepared which support Plastino/Brown's calculations. Those two documents also support an inference that loan fees totaled $1.38 million. Thus, there is a genuine issue of material fact with respect to whether loan fees in excess of the two point limit were charged, and we need not consider whether the brokers' fees, finders' fees, and loan servicing fees should be classified as loan fees.[10]

C. The Effect of the Failure of the Conditions of the Subordination Agreement

Eureka argues that whether or not the conditions of the subordination agreement were met is wholly irrelevant to the question of the priority of its lien. It first relies on clause (g) of the Construction Loan section of the rider, which provides in part:

> Beneficiary acknowledges that the Construction Lender, in making disbursements pursuant to any Construction Loan agreement, will be under no obligation or duty, nor will the Construction Lender represent that it will ensure the proper application of Construction Loan funds. Any application or use of Construction Loan funds, for purposes other than those provided for in the Construction Loan agreement, *shall not defeat, alter, or invalidate the lien of the Construction Trust Deed in whole or in part.*

(Emphasis added).

It is apparent from the terms of the disclaimer that clause (g) only applies to violations of the requirement that loan funds be used for the project. It does not apply to a violation of the two point loan fee limit. Thus, the provision does not excuse Eureka from the consequences of any failure of the condition relating to excessive loan fees. Rather, it applies only to the issue we do not reach, relating to the diversion of funds.[11]

Relying on general principles of California contract law, Eureka next argues that even if the conditions of the Plastino/Brown deed rider were violated, the appropriate remedy is not to make Plastino/Brown's deed senior to Eureka's, but to reduce the amount of Eureka's lien by an amount equal to the interest charged in excess of two percent and/or the value of any funds diverted. In other words, Eure-

---

**10.** To support its contention that construction loan fees were in fact two points, Eureka points to Jamieson's deposition, in which he stated that Eureka was to receive a two percent "origination fee." Eureka also points to a Sunset application for payment that lists $660,000 under the heading "Construction Loan," and a project cost breakdown sheet that lists $660,000 as a "Construction Loan." While this evidence may cast doubt on Plastino/Brown's contention that loan fees exceeded two points, a genuine triable issue remains.

**11.** Although we do not reach the issue of the prohibition on diversions of funds, we note that while the disclaimer applies to violations of that prohibition, it appears to be of limited scope. It

may well absolve Eureka of any responsibility to police the conduct of any of the other parties utilizing construction loan funds, but we do not agree with the assertion that it permits Eureka itself to participate knowingly in an improper application of loan funds. The most reasonable reading of the disclaimer language, at least at this stage of the proceedings, is that Eureka would not be held responsible for matters it did not know about. On the other hand, if it did know of a continuing course of violations, we doubt that it could escape responsibility by relying on the clause at issue. Certainly we do not believe it could itself deliberately violate the provision and point innocently to the disclaimer provision.

ka argues that compliance with the conditions of the deed rider is not a condition precedent to the seniority of Eureka's lien. Eureka points out that even if all of Plastino/Brown's factual allegations are true, when Eureka's lien is reduced by the appropriate amount, it still exceeds the amount obtained from the bankruptcy trustee's sale of the property.

 Proceeding on the assumption that the deed rider does not state whether fulfillment of its conditions is a necessary condition to Eureka's lien retaining priority, we must turn to general principles of California law.[12] Eureka relies principally on two cases for the proposition that violation of a condition of the subordination voids the subordination only to the extent of the violation. *See United States Cold Storage of Calif. v. Great Western Savings & Loan Assoc.*, 165 Cal.App.3d 1214, 212 Cal.Rptr. 232 (1985); *Miller v. Citizens Savings & Loan Assoc.*, 248 Cal.App.2d 655, 56 Cal.Rptr. 844 (1967). However, those cases involved *implied* conditions on the subordination. In each case the seller agreed to subordinate his lien to the lender's lien without conditions, and the court held that to protect the seller, it was necessary only to reduce the lender's lien by an amount equal to the value of the improper disbursals. Where, as here, the subordination conditions in the seller's lien are *express*, the California courts require substantial compliance with those provisions as a necessary condition to the lender's lien retaining any priority over the seller's. *See Jones v. Sacramento Savings and Loan Assoc.*, 248 Cal.App.2d 522, 56 Cal. Rptr. 741 (1967) (holding that in order to achieve any priority, the lender's encumbrance must substantially comply with the conditions of the seller's subordination, but, under circumstances not present here, also allowing equitable lien to lender against developer to avoid developer's unjust enrichment); *Collins v. Home Savings and Loan Assoc.*, 205 Cal.App.2d 86, 22 Cal.Rptr. 817 (1962).[13]

12. Our resort to general principles of California law does not preclude a finding after trial that the consequences of a violation of the terms of the deed rider are found in the deed rider itself. Should this question be disputed at trial, we note that Plastino/Brown should be permitted to offer the testimony of the attorney who drafted the deed rider as evidence of the intent of the parties. This testimony meets the test laid down by Chief Justice Traynor for admissibility of extrinsic evidence to support a particular contract interpretation: it "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 564 (1968). Although the Federal Rules of Evidence apply in an action in federal court in which state law provides the rule of decision, *see American Title Ins. Co.*, 861 F.2d at 226, the question whether a particular kind of evidence is admissible to prove the meaning of a contract is governed by state law. *See Wilson Arlington Co. v. Prudential Ins. Co. of American*, 912 F.2d 366 (9th Cir.1990) (applying Virginia parol evidence rule).

13. The justification for treating implied subordination conditions differently from express subordination conditions is not discussed in the California case law. However, the distinction may be based upon the fact that recovery is sought under a different legal theory when the conditions are express rather than implied. A lender's diversion of $x may begin a chain of events that ultimately results in a reduction in the value of the property that exceeds $x. Where the seller has subordinated his lien to the lender's only on the express understanding that the lender would not divert funds, the most effective way to protect the seller's legitimate expectation that the lender will in fact use the funds for the project is to make compliance by the lender a condition precedent to the priority of his lien. The expectation is one that the seller has deemed important enough specifically to include in the agreement (at least in theory). Making the subordination contingent on compliance with that condition is a result for which he has bargained. By contrast, implied conditions on the lender's use of the funds are based on equitable principles which the parties may not even have considered at the time they entered into the agreement. Some of these principles may not be of major importance to the seller. For example, one of the purposes of reducing a lender's lien for a non-project disbursal is to prevent the lender's unjust enrichment; the lender is not allowed to retain the full value of his lien plus any benefits he may have received for the non-project disbursals. Hence, when this equitable consideration underlies the court's action, the violation of the implied condition by the lender reduces the lender's lien, but does not render it entirely inferior to the seller's. If the seller desires a more complete remedy, he has the option of making the condition an express part of the agreement.

■ As we have noted, for purposes of summary judgment, we must assume that the loan fees were in excess of twice the two point limit. Eureka does not contend that there was, nevertheless, substantial compliance with the conditions of the subordination. In any event, whether there is substantial compliance with a condition precedent to a contract is a question of fact. *Cline v. Yamaga*, 97 Cal.App.3d 239, 248, 158 Cal.Rptr. 598, 603 (1979). We certainly cannot conclude at this stage in the proceedings that there was substantial compliance. Thus, for present purposes, we must assume that if the terms of the subordination agreement were violated in the manner alleged, Plastino/Brown's lien would become senior to Eureka's. And since we have already concluded that the determination whether a violation occurred depends upon facts that are in dispute, we must reverse the grant of summary judgment with respect to Plastino/Brown's claim for declaratory relief and its quiet title action.

## II. *Plastino/Brown's Conspiracy to Defraud Claims Against Eureka and Jamieson*

Plastino/Brown's conspiracy to defraud claims against Eureka and Jamieson are based on the theory that Plastino/Brown were fraudulently induced into accepting Sunset's note in partial payment of the purchase price for the property. According to Plastino/Brown, Jamieson and Eureka conspired with the Sunset principals to induce Plastino/Brown to subordinate their

lien in exchange for a promise that Jamieson and Eureka knew the Sunset principals did not intend to keep—the promise that all of the construction loan funds would be used for the project.

"The elements of fraud ... are (1) misrepresentation (false representation, concealment or non-disclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Hackethal v. National Casualty Co.*, 189 Cal.App.3d 1102, 1111, 234 Cal.Rptr. 853, 857 (1987). We now consider whether, viewed in the light most favorable to Plastino/Brown, the evidence could support their claims against Eureka and Jamieson.

### A. Conspiracy to Defraud Claims Against Eureka

■ Plastino/Brown argue that Eureka is liable for the fraudulent misrepresentations of its alleged co-conspirators.[14] Specifically, Plastino/Brown contend that Eureka conspired with the Sunset joint venturers to induce Plastino/Brown to subordinate their deed of trust without disclosing that Eureka did not intend to comply with the conditions in the deed of trust.[15] Under this theory, Eureka would be liable for the misrepresentations of Sunset, even though Eureka itself made no fraudulent misrepresentations or non-disclosures. *See Guild Mortgage Co. v. Heller*, 193 Cal. App.3d 1505, 1514, 239 Cal.Rptr. 59, 65 (1987) (one member of civil conspiracy is liable for the fraudulent misrepresentations of another).

**14.** Plastino/Brown somewhat erroneously charge the defendants with a "conspiracy." Under California law there is no *separate* tort of civil conspiracy. Rather, the tort is the harm done, while liability is joint because of concerted action. *Youst v. Longo*, 43 Cal.3d 64, 79, 233 Cal.Rptr. 294, 304, 729 P.2d 728, 739 (1987).

**15.** Eureka contends that Plastino/Brown's conspiracy theory was not present in their complaint, making its first appearance in their opposition to Eureka's summary judgment motion. This contention is incorrect. Both the third and fourth claims for relief in Plastino/Brown's complaint alleged a conspiracy. It is unclear whether the district court considered conspiracy as a ground for relief. The district court's rejec-

tion of Plastino/Brown's third claim for relief was apparently predicated on the factual determination that Eureka itself made no representations—fraudulent or otherwise—to any of the defendants. The district court did not state any conclusion regarding alleged fraudulent statements made by others in furtherance of a conspiracy with Eureka. Similarly, the district court's rejection of Plastino/Brown's fourth claim for relief was apparently predicated on the factual determination that Eureka itself was under no fiduciary duty to disclose information concerning the project to Plastino–Brown, without mentioning any duty owed by Eureka's alleged co-conspirators.

■ Although an express agreement need not be shown for a plaintiff to prevail on a civil conspiracy claim, there must be at least a tacit understanding. *See Cully v. Bianca,* 186 Cal.App.3d 1172, 1176, 231 Cal.Rptr. 279, 281 (1986). As discussed above, *see supra* at 1509–11, there is evidence from which it can be inferred that Eureka knew of the terms of the subordination agreement before Plastino/Brown's deed was recorded. Eureka could have granted prior approval to the Sunset principals' supposed plan to offer the deed rider terms as a fraudulent inducement. Under California law, the existence of a conspiracy "may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *Greenwood v. Mooradian,* 137 Cal.App.2d 532, 538, 290 P.2d 955, 959 (1955). Plastino/Brown's sale of their land was a prerequisite to the existence of the Sunset project, and therefore a prerequisite to Eureka's opportunity to divert funds. Thus, under the *Greenwood* test, it might be inferred from Eureka's interests and its close relationship with Baywood, that Eureka was privy to the alleged deception of Plastino/Brown from the very beginning. If the record supports the inference that Eureka knowingly diverted project funds, then a fact-finder could conclude that all of the circumstances support an inference of a conspiracy. Hence we now consider each of the diversions Plastino/Brown has alleged.

■ Plastino/Brown contend that Eureka diverted project funds in five ways: (1) that with Jamieson's approval Eureka issued a $200,000 letter of credit ultimately traceable to the Sunset construction loan account to settle a lawsuit by Dr. Peter Delorio against Baywood Equities, one of the joint venturers in Sunset, on a claim unrelated to the Sunset project; (2) that Baywood Equities, acting pursuant to Jamieson's instructions, paid $100,000 to the Perini corporation out of Sunset project funds in order to pay off an unrelated loan from Perini to Baywood Equities; (3) that Jamieson signed a $200,000 check on behalf of Eureka for "return of capital" to Riley–Bower, one of the Sunset joint-venturers; (4) that Eureka, with Jamieson knowingly participating, diverted $60,000 in project funds to Angelo Quaranta, and that these funds ultimately went to the Chairman of the Board of Directors of Eureka, Kenneth Kidwell; and (5) that Eureka diverted nearly $2 million to Baywood Equities as fraudulent "construction management fees." We briefly consider the evidence in support of each of these alleged diversions.

1. *The $200,000 letter of credit to settle Delorio's lawsuit against Baywood.*

The parties do not dispute that a $200,000 letter of credit was issued to Baywood. Eureka contends that the funds were not drawn on Baywood's construction loan account,[16] and thus do not constitute a diversion. Eureka's contention is supported by the declaration of Thomas Ginella. Plastino/Brown rely primarily on the uncompleted deposition of Baywood President James Zetz and the declaration of Dennis Alfaro, the former controller of Baywood. Alfaro states in his declaration that Eureka loan officer Elliot Nosaka told him that Jamieson had instructed Nosaka to cover up a diversion of funds from the construction loan account. Although contradicted by other evidence, if admissible this statement would raise a genuine issue of material fact concerning the diversion.

■ Eureka objects that Nosaka's statement to Alfaro is hearsay. However, since at the time Nosaka made the statement to Alfaro, Nosaka was Eureka's "agent or servant [discussing] a matter within the scope of the agency or employment," it is not hearsay. Fed.R.Evid. 801(d)(2)(D). Eureka also objects to the use of the Zetz deposition because it was not completed. However, as with the Ginella deposition discussed above, *see supra* at 1509–10, the deposition is admissible.

16. Eureka contends that Baywood maintained a separate account with Eureka for its earned fees, and that there were no restrictions on Baywood's capacity to draw on this account.

### 2. The $100,000 to the Perini corporation.

The principal allegation of Eureka's knowledge that the payment of project funds to Perini was for non-project activities consists of the uncompleted Zetz deposition. Eureka objects that Zetz's recital of statements made by Baywood representatives are inadmissible hearsay and restates its objection to the use of an uncompleted deposition. As noted above, the statements are admissible. Although a fact-finder would certainly be entitled to find that the substantial documentary and testimonial evidence offered by Eureka implies that neither it nor its agents had knowledge of the fraudulent payment,[17] there is a genuine issue of material fact.

### 3. The $200,000 "return of capital" to Riley–Bower.

■ The evidence of a wrongful "return of capital" is a $200,000 check to Riley–Bower with that phrase written in the memo portion. The check appears to bear Allan Jamieson's signature, although the parties dispute whether this is the case. In any event, the check was not authenticated, and therefore is inadmissible. Thus, this claimed diversion finds no support in the record.

### 4. The $60,000 for Kenneth Kidwell via Angelo Quaranta.

■ Plastino/Brown's allegation that project funds were diverted to Kenneth Kidwell is supported by the Zetz deposition, in which Zetz contends that he was told of the diversion by Ginella. Plastino/Brown argue that this is not hearsay because it is the statement of a co-conspirator; Ginella represented alleged co-conspirator Baywood Equities. The statement does not fall under the rule, however, since it was not made "in furtherance of the conspiracy," but after the fact. As with all of Plastino/Brown's charges, the alleged diversion to Kidwell is disputed by Jamieson's deposition. It is also called into question by Nosaka's deposition testimony that it was not unusual for him to deliver checks to Kidwell when instructed to do so by his superiors. Thus, excluding inadmissible evidence, there is no genuine issue here.

### 5. The approximately $2 million to Baywood Equities as fraudulent "construction management fees."

■ These allegations also depend upon the Zetz and Ginella depositions. For the reasons given above, that evidence is admissible, and though contested by other admissible evidence supporting Eureka's view of the transactions, leaves a genuine issue of material fact.

Viewing the admissible evidence in the light most favorable to Plastino/Brown, we find that the record could support an inference of three diversions: the letter of credit; the payment to Perini; and the construction management fees.[18] These diversions in turn could support an inference that Eureka was engaged in a conspiracy to defraud Plastino/Brown. Consequently, the district court should not have granted summary judgment on these claims.

### B. Plastino/Brown's Conspiracy to Defraud Claim Against Jamieson

The evidence offered by Plastino/Brown to show that Jamieson took part in the diversion of funds is essentially the same evidence offered against Eureka. Most of Plastino/Brown's allegations regarding diversions rely on the Zetz deposition testimony or the Alfaro declaration containing

---

**17.** For example, Perini's correspondence with Baywood indicates that Baywood was attempting to defraud Eureka without Eureka's (or Jamieson's) knowledge.

**18.** Eureka argues that it cannot have used the Sunset project as a vehicle to defraud Plastino/Brown because Eureka in fact *lost money* on the project. Although this fact is certainly relevant to the determination of the existence of a conspiracy to defraud Plastino/Brown, it is not dispositive at the summary judgment stage. Eureka may have *hoped* to profit from the deal by defrauding Plastino/Brown. Alternatively, Eureka may have anticipated losing money on the project, but calculated that it would receive compensating collateral benefits from the diversions to the Sunset principals. Either of these inferences is consistent with the record.

the statements made by Nosaka to Zetz and Alfaro. Jamieson argues that none of this evidence is admissible against him.

Preliminarily, the fact that the Zetz deposition was not completed does not render it inadmissible. *See supra* at 1509–10. Plastino/Brown offer two theories for admitting Zetz' and Alfaro's statement about what Nosaka told them. First, Plastino/Brown argue that the statements are admissible under the co-conspirator rule. Fed.R.Evid. 801(d)(2)(E). Under *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), it is permissible for the court to look to the proffered hearsay itself to determine if there is a conspiracy. However, Rule 801(d)(2)(E), by its terms, requires that the statement be made "in furtherance of the conspiracy." Since all of the statements made by Nosaka to Zetz and Alfaro were revelations of past conduct, which if anything had the effect of frustrating the conspiracy, they do not qualify under the rule.

Plastino/Brown's second theory is that Nosaka's statements are admissible against Jamieson because Nosaka, as an officer of Eureka working under Jamieson's supervision, was Jamieson's "agent or servant [discussing matters] within the scope of the agency or employment...." Fed.R.Evid. 801(d)(2)(D). Nosaka was not employed by Jamieson, but by Eureka. Thus, while it is unquestionably true that Nosaka's statements are admissible against Eureka, whether they are admissible against Jamieson is less clear. The Eighth Circuit has held that the mere fact that one employee of an enterprise (in that case the government) is subject to the supervision of someone else in the hierarchy, does not render the employee his supervisor's agent. *See Ellis v. Kneifl,* 834 F.2d 128, 131 (8th Cir.1987) (holding that clerk is not judge's agent within the meaning of the rule). However, our prior cases suggest that Nosaka's statements are admissible against Jamieson. Under circumstances where an employee's superior has instructed the employee to act in furtherance of a fraudulent scheme, statements made by the employee relating to that scheme are admissible against the superior under Fed.R.Evid. 801(d)(2)(D). *See United States v. Gibson,* 690 F.2d 697, 701 (9th Cir.1982), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1446, 75 L.Ed.2d 801 (1983) (alternative holding). Significantly, the statements need only *concern* matters within the scope of the agency; they need not be made within the scope of the agency. *Hoptowit v. Ray,* 682 F.2d 1237, 1262 (9th Cir.1982).

Since Nosaka was allegedly instructed by his superior Jamieson to cover up a diversion of funds—clearly an instruction to act in furtherance of a fraudulent scheme—his statements to Zetz and Alfaro about the instruction are admissible against Jamieson. Thus, all of the evidence admissible against Eureka to show a diversion is also admissible against Jamieson. In addition to that evidence, Plastino/Brown have also pointed to portions of Zetz' deposition which show that Jamieson instructed Perini to draft a phony bill to be paid out of project funds. Taken together, all of this evidence could support an inference that Jamieson knowingly participated in several diversions of funds.

The fact that Jamieson participated in diversions is not by itself enough to establish that he conspired with the Baywood principals to defraud Plastino/Brown. While there is evidence from which it may be inferred that Eureka as an institution knew the terms of the Plastino/Brown subordination before their deed was filed, there is no evidence that Jamieson himself had such knowledge. Nevertheless, the California courts have stated that one may be held liable for a civil conspiracy where without prior knowledge he *ratifies* the acts done for his benefit by a wrongdoer. *See Cully v. Bianca,* 186 Cal.App.3d 1172, 1176, 231 Cal.Rptr. 279, 281 (citing *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 604, 163 Cal.Rptr. 132, 140, 607 P.2d 924, 932 (1980)). It is undisputed that Jamieson learned of the existence of the Plastino/Brown deed rider before the alleged diversions took place. As we have noted, the deed rider placed a duty on Eureka and its agents—including Jamieson—not to participate knowingly in the violation of any of

its terms. *See supra*, n. 12. From the allegation that Jamieson violated that duty it could be inferred that he ratified the initial fraud of the Baywood principals.[19] Thus, summary judgment was improper on Plastino/Brown's claim that Jamieson is jointly liable as a conspirator.

### III. *Plastino/Brown's Motion for Summary Judgment Against Eureka*

Plastino/Brown contend that they are not only entitled to a reversal of the district court's grant of summary judgment for Eureka and Jamieson, but that summary judgment should be entered for Plastino/Brown. Because there are material issues of fact that must be resolved to determine which party should prevail on each of Plastino/Brown's claims, they are not entitled to summary judgment.

### IV. *Sanctions and Attorneys' Fees*

Plastino/Brown request attorneys' fees as a sanction for what they term the "vexatious conduct" of Eureka in filing an affidavit that Eureka allegedly knew to be false, and in refusing to withdraw the affidavit once its supposed flaws were exposed. Plastino/Brown refer to the affidavit of Deborah Imamura, which they contend was inconsistent with the answer to an interrogatory that Eureka had previously submitted. However, we find that Ms. Imamura's affidavit was consistent with that answer. Thus, it was not improper for Eureka to submit (and not to withdraw) the affidavit.

■■■ Not to be outdone, Eureka seeks double costs and attorneys' fees against Plastino/Brown under Fed.R.App.P. 38 and 28 U.S.C. § 1912 for Plastino/Brown's "frivolous appeal." Since Eureka is not a "prevailing party" it is not entitled to costs under 28 U.S.C. § 1912. Needless to say, Plastino/Brown's meritorious appeal is hardly frivolous. In fact, it is Eureka's

request that comes perilously close to warranting sanctions.

### CONCLUSION

Because there are genuine issues of material fact concerning each of the claims presented on this appeal, we reverse the district court's entry of summary judgment in both No. 89–55705 and No. 89–55707.

REVERSED AND REMANDED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting.

The majority holds that summary judgment against Plastino/Brown on its claims for declaratory relief and fraudulent misrepresentation was improper because of the existence of material questions of fact as to Eureka's actual knowledge of the terms of the subordination agreement between Plastino/Brown and Sunset Bay Associates. Because I do not believe the record supports that conclusion, I respectfully dissent. I also write separately to express my disagreement with the majority's alternate holding that under *Middlebrook–Anderson Co. v. Southwest Sav. & Loan Ass'n*, 18 Cal.App.3d 1023, 96 Cal. Rptr. 338 (1971), a construction lender acquiring priority through a subordination by subsequent recording is obligated to investigate the terms of the borrower-seller subordination agreement and will lose its priority if the terms of that agreement are violated.

### I

To survive Eureka's cross-motion for summary judgment, Plastino/Brown was required to set forth *"specific facts"* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). Our duty is "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or

---

**19.** Plastino/Brown also contend that Jamieson had a motive to divert funds because Baywood allegedly paid over $23,000 for the construction of Jamieson's personal residence. This contention is based entirely on the deposition testimony of Matthew Zetz, James Zetz' son. Matthew Zetz stated that he believed he was paid by Sunset to work on Jamieson's personal residence as a kickback for Jamieson's help in obtaining loans for Sunset. However, Matthew Zetz did not give the source of his belief. His testimony is therefore inadmissible since it is not based on personal knowledge. Fed.R.Civ.P. 56(f).

contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986)). "Inferences from the nonmoving party's 'specific facts' as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts...." *Id.*

We must also review the grant of summary judgment in light of the parties' burdens of persuasion. If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial," summary judgment should be entered against him. *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Plastino/Brown, as the party seeking equitable subordination, bears the burden of persuasion that it has been harmed by the inequitable conduct of another creditor. *In re Westgate–California Corp.*, 642 F.2d 1174, 1177–78 (9th Cir.1981). Similarly, to prevail on its cause of action for fraudulent misrepresentation, Plastino/Brown is required to establish that at the time of subordination, Eureka had actual knowledge both of the terms of the Plastino/Brown promissory note and of Sunset Bay Associates' alleged intent not to abide by those terms. *See Cully v. Bianca*, 186 Cal. App.3d 1174, 1176, 231 Cal.Rptr. 279, 281 (1986). The burden is thus on Plastino/Brown affirmatively to establish material questions of fact as to Eureka's actual knowledge. This is true even though evidence of actual knowledge is likely to be within Eureka's possession, since Plastino/Brown has had a full opportunity to conduct discovery. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15.

### A

In finding that summary judgment against Plastino/Brown was improper, the majority identifies three "specific facts" tending to establish that Eureka had actual knowledge of the terms of the subordination agreement: (1) Jamieson's testimony that Eureka required a "specific" subordination agreement; (2) Ginella's testimony about the timing of his delivery of a copy of the Plastino/Brown promissory note to Eureka; and (3) Pearlson's testimony that during discovery an undated copy of the note was found in Eureka's files.

What the majority fails to identify are the "undisputed background or contextual facts" against which this evidence is to be viewed. *T.W. Elec.*, 809 F.2d at 631. There is no direct evidence that Eureka received a copy of the terms of the subordination agreement prior to the recording of the Eureka and Plastino/Brown deeds. In fact, Plastino/Brown, their attorneys, and the attorneys for Sunset Bay Associates *all* testified that they had no substantive communication with Eureka before Eureka's trust deed was recorded. Moreover, no documents relating to the conditions in the Plastino/Brown deed dated *prior* to recording were found in Eureka's files.

Turning to the "specific facts" at issue, the majority concludes that Jamieson's reference "to a *specific* subordination agreement could imply that Eureka required the particular subordination agreement that ended up in the Plastino/Brown deed rider and note." Majority at 1509. Such an inference is proper only if reasonable in light of undisputed background or contextual facts. *T.W. Elec.*, 809 F.2d at 631. Here, the context and undisputed background facts provide no basis for the inference drawn by the majority. Jamieson's deposition is devoid of any further reference to a "specific" subordination agreement; in fact, it is clear from reading the entire transcript that he was referring to Eureka's general policy that a first deed of trust be protected by a subordination agreement, rather than to a particular subordination agreement.[1] Moreover, since

1. Q. Do you remember any discussion that you had with Mr. Ginella about the subordi- nation?

there is absolutely no evidence in the record that either of the parties to the subordination agreement had any substantive contact with Eureka, the majority's inference that "someone" at Eureka had actual knowledge of the terms of that agreement is unfounded.

The majority candidly states that the Ginella deposition is "hardly a model of clarity." Majority at 1510. I would describe it as unintelligible. Ginella stated that he physically delivered the Plastino/Brown promissory note and deed of trust to Eureka

> Sometime *prior.* Three months *prior* to the time that we closed the construction loan. A month or two *after* we closed.

Acknowledging that this statement may be interpreted to mean different things, the majority nevertheless concludes that "for purposes of summary judgment, we must conclude that it supports Plastino/Brown's contention that a note was delivered to Eureka before Eureka's deed was recorded." Majority at 1510.

> A. Other than the fact that there would be a subordination, no.
> Q. Do you know whether or not anyone at Eureka ever approved that subordinate financing?
> MR. FURNISS: I object to the question as vague and ambiguous. What do you mean by "approved that subordinate financing"?
> MR. PEARLSON: Acknowledged, agreed to it.
> MR. FURNISS: Still vague. Eureka didn't agree to subordinate financing.
> A. We at Eureka were all aware of it. We required a specific subordination agreement as a condition of closing.
> MR. PEARLSON: Q. How do you know that?
> A. Because we required a first deed of trust. If there was an interest, it took priority over our interest in the property, it would either have had to be paid off or subordinated.
> Q. Did you talk to anyone in the loan closing department about that subordination agreement prior to the funding of the construction loan?
> . . . .
> A. ... I don't recall any specific conversations with any of my subordinates about this matter. Only that the overly [sic] charge to the various departments was to ensure that we had a first deed of trust. From my perspective anybody who was behind us did not concern me that much.

The majority's efforts to turn Ginella's doublespeak into a "specific fact" precluding summary judgment fail for two reasons. First, the statement itself is so inherently inconsistent that it cannot reasonably be contorted to support the meaning given it by the majority. As we stated in *T.W. Electrical,* "Clearly, there must be some limit on the extent of the inferences that may be drawn in the nonmoving party's favor from whatever 'specific facts' it sets forth; if not, Rule 56(e)'s requirement of 'specific facts' would be entirely gutted." 809 F.2d at 631. Second, the majority's "spin" on Ginella's true meaning is wholly contradicted by the context in which he made the statement quoted above. Ginella twice stated during his deposition that he could not recall whether he delivered the promissory note and deed of trust before or after the closing of the construction loan. His garbled assertion came only after prodding by Plastino/Brown's attorney.[2] In the context of the entire deposi-

---

2. Q. Mr. Ginella, did you cause at any point in time a copy of Exhibit 70 [the promissory note and deed of trust] to be delivered to Eureka?

Why don't we broaden the question to Exhibit 70 or any draft of that exhibit.

. . . .

THE WITNESS: I recall that Eureka required the form and consent of the subordination agreement and note to be part of their file at some point in time. *I don't know whether it was before we signed this or after, but they required it.*

MR. MARCUS: I move to strike that as not being responsive to the question.

THE WITNESS: They required it at one point in time, *and when it was as far as historically or chronologically as to when we gave it to them, as before or after we signed the construction loan agreement, I don't recall.*

MR. PEARLSON: Q. By "it" what are you referring to?

A. The Plastino promissory note and deed of trust. Your question was whether or not I had ever caused to be delivered this promissory note and deed of trust.

Q. Exhibit 70?

A. Yes, Exhibit 70, to Eureka. And I'm saying, yes, we had cause to deliver it to them, Sunset Bay Associates, *at some point in time.*

Q. You're saying you did deliver it to them at some point in time?

A. Yes.

tion, the majority's reconstruction of Ginella's internal thought processes is wholly unreasonable and cannot be construed as a "specific fact" precluding summary judgment.

Finally, the majority relies on the fact that Eureka's files contained a dated copy of the Plastino/Brown deed of trust and an undated copy of the promissory note. From this fact it draws the inference that Eureka received the note before the deed was recorded and that it therefore had actual notice of its terms. Again, this inference must be viewed against the backdrop of undisputed facts. In the absence of any credible evidence that Eureka received direct notice of the terms of the subordination, the mere presence of an undated note in Eureka's files cannot, in itself, create a material question of fact.

B

Because Plastino/Brown have failed to put forth sufficient "specific facts" such that a rational jury or trier of fact would conclude that Eureka had actual knowledge of the terms of the subordination agreement, I would affirm the district court's grant of summary judgment against them on their action for declaratory relief.

I would also affirm the entry of summary judgment against Plastino/Brown on their claim that Eureka acted in concert with Sunset Bay Associates to fraudulently induce them into subordinating their lien to Eureka's. To state a cause of action for civil conspiracy, a plaintiff must establish, at a minimum, a tacit understanding among those alleged to have acted in concert. *Cully,* 186 Cal.App.3d at 1176, 231 Cal. Rptr. at 281. The majority claims that the "specific facts" cited above are sufficient evidence of such an understanding. I disagree. Liability as a joint tort-feasor may be imposed only upon

"those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit."

*Id.* (quoting *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 604, 163 Cal.Rptr. 132, 140, 607 P.2d 924, 932 (1980) (internal citations omitted)). Not only is there no evidence that Eureka knew of the terms of the Plastino/Brown promissory note, there is simply no evidence that Eureka or Jamieson aided or encouraged Sunset Bay in inducing Plastino/Brown to subordinate their deed of trust to Eureka's.

II

I do not share the majority's view that under *Middlebrook–Anderson Co. v. Southwest Sav. & Loan Ass'n,* 18 Cal. App.3d 1023, 96 Cal.Rptr. 338 (1971), a construction lender that has acquired priority over a seller's purchase money security interest through subordination by subsequent recording is obligated to investigate the terms of the borrower-seller subordination agreement, and will lose its priority if the terms of that agreement are violated, even if the lender lacks actual knowledge of the terms of the agreement.

The majority relies on only two California cases in declaring this rule: *Middlebrook–Anderson* and *Radunich v. Basso,* 235 Cal.App.2d 826, 45 Cal.Rptr. 824 (1965). Neither case supports its holding.

*Middlebrook–Anderson* holds that if a construction lender has actual knowledge of the terms of a subordination agreement and knows of the seller's reliance, an agreement by the lender to abide by the terms of that agreement will be implied. Because it was departing from prior California case law, *see Grenada Ready–Mix Concrete, Inc. v. Watkins,* 453 F.Supp. 1298, 1313 (N.D.Miss.1978); *United States Cold Storage of California v. Great Western Sav. & Loan Ass'n,* 165 Cal.App.3d 1214, 1231, 212 Cal.Rptr. 232, 242 (1985), the *Middlebrook–Anderson* court was careful to limit the scope of it holding to the facts before it.

Q. I know you can't give me an exact date, but can you give me an outside date of when that occurred?

A. Sometime *prior.* Three months *prior* to the time that we closed the construction loan. A month or two *after* we closed.

An implied agreement in the instant case can, and in equity, should be spelled out from the lender's alleged *actual knowledge* of the provisions of the seller's lien in general, and of the subordination therein in particular.... Its loan *under the circumstances* cannot be viewed other than as subject to the fair application of the construction funds....

Here, it is alleged the lender, *with full knowledge* of the subordinated lien of the seller, disbursed the funds without limitation....

We hold the actions of the parties here, *if proved as alleged,* did create a subordination agreement, and the lender's failure to protect seller's security interest gives seller a cause of action; ....

18 Cal.App.3d at 1037–38, 96 Cal.Rptr. at 347 (emphasis added).

Subsequent California cases have consistently noted the limited nature of a lender's obligations under *Middlebrook–Anderson. See Gluskin v. Atlantic Sav. & Loan Ass'n,* 32 Cal.App.3d 307, 314, 108 Cal.Rptr. 318, 322 (1973) (*"Middlebrook* imposed on the lender the obligations of an implied agreement that the lender's priority extended only to loan amounts properly expended for construction purposes ... [when] the lender voluntarily assumed control of the disbursements, *knew of the seller's security interests and knew that the seller's lien was subordinated only on condition that loan funds were to be used just for construction purposes."*) (emphasis added); *Woodworth v. Redwood Empire Savings & Loan Ass'n,* 22 Cal.App.3d 347, 363, 99 Cal.Rptr. 373, 384 (1972) (*"Middlebrook* ... impos[es] on the lender an implied agreement to protect the seller's interest *because of the lender's actual knowledge of the provisions of the seller's lien and subordination provision...."*) (emphasis added).

Contrary to the majority's assertion, neither *Middlebrook–Anderson* nor any other California case has ever suggested that, absent actual knowledge of the terms of a subordination agreement, a lender is bound by the terms of that agreement. Nor has a California court imposed a duty on a lender, who is otherwise unaware of the provisions of a subordination agreement, to investigate its terms and be bound by them. The majority's reliance on *Radunich v. Basso,* 235 Cal.App.2d 826, 835, 45 Cal. Rptr. 824, 830 (1965), as support for such a duty is misplaced. There, as in *Middlebrook–Anderson,* the lender had actual knowledge of the terms of the subordination agreement. As the *Middlebrook–Anderson* court observed

[T]he lender *knew of the variance between the actual intended use for the loan proceeds and the use restriction in the subordination clause.* The lender was thus on notice of a possible violation of the agreement and under a duty to ascertain the true facts from the seller.

18 Cal.App.3d at 1032, 96 Cal.Rptr. at 343 (emphasis added); *see also Radunich,* 235 Cal.App.2d at 835, 45 Cal.Rptr. at 830.

Reduced to its essentials, the majority seeks, without any support under California law, to shift the risk of loss to a construction lender when the lender and the seller have jointly financed a construction project. Whatever the merits of that policy choice, *cf.* 3 H. Miller & M. Starr, Current Law of California Real Estate § 8:167 at 655 n. 78,[3] it should be made by the California courts, not by this court.

---

**3.** "The result of making a lender responsible to third parties who do not have privity for off-record agreements is to make it an insurer of the seller's profits. In all likelihood he has received more than fair market value for his property to assume some risk, and the lender should not be burdened with insuring that risk."